**UNITED STATES of America, Plaintiff-Appellant,**

v.

**STANDARD OIL COMPANY OF CALIFORNIA, a corporation, Defendant-Appellee.**

**No. 72–2782.**

United States Court of Appeals, Ninth Circuit.

May 4, 1976.

As Modified on Denial of Rehearing Dec. 13, 1976.

---

**626**

Dirk D. Snel and David W. Miller, Attys. (argued), of Lands & Natural Resources Div., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Turner H. McBaine (argued), of Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant-appellee.

Before BROWNING and SNEED, Circuit Judges, and SHARP,* District Judge.

PER CURIAM:

This lawsuit is the result of contractual disputes between the United States Navy, plaintiff-appellant, and the Standard Oil Company of California, defendant-appellee. The case involves three separate claims arising out of two contracts between Navy and Standard relating to their respective rights and obligations as the participants in the unit operation of Naval Petroleum Reserve No. 1 (Elk Hills). These contracts are the Unit Plan Contract of June 19, 1944 (hereinafter the "UPC") and the Amendatory and Supplemental Agreement of December 22, 1948 (hereinafter the "A & S Agreement").

Navy's first claim is for a declaratory judgment that certain lands outside the present boundaries of the Reserve, some owned by Navy and some by Standard, be brought within the unit operation. Navy's second and third claims are for approximately $500,000 each, plus interest, as alleged overpayments of its proper share of particular costs during the periods July 1, 1947, to May 8, 1948, and March 13, 1949, to December 1, 1957.

Upon completion of an extended nonjury trial, the district court entered findings of fact, conclusions of law, and judgment denying each of Navy's claims. The three claims are discussed separately below.

GENERAL BACKGROUND

A proper appreciation of the issues is dependent upon an understanding of the origin, development and operation of the Elk Hills Reserve. This background material was supplied to the trial court by way of an agreed pretrial statement, reading in pertinent part as follows:

"Naval Petroleum Reserve No. 1 (the Reserve) was established in 1912 and is located in the Elk Hills in Kern County, California, about twenty-five miles southwest of Bakersfield. At the turn of the century, Government lands in the West were rapidly being turned over to private ownership. At the same time, there was a growing realization of the importance of oil for the Navy, which was then changing its ships from coal to oil burning. In response to arguments that the Government should preserve oil for Naval purposes, President Taft withdrew large portions of land in California and Wyoming from eligibility for private ownership, and in 1912 set aside Naval Petroleum Reserve No. 1 by an Executive Order. In the next several years, the three other Naval petroleum reserves were set aside: one more in California, one in Wyoming and one in Alaska.

"The establishment of the Reserve was expressly made subject to pre-existing private ownership. There are approximately 46,000 acres within the Reserve, approximately one-fifth is owned by Standard and the remainder, approximately four-fifths by Navy. The Standard lands are not in one block, but are checker-boarded throughout the Reserve. The Executive Order establishing the Reserve affected the Government lands in

* Honorable Morell E. Sharp, United States District Judge for the Western District of Washington, sitting by designation.

the field as far as future use and disposition were concerned, but it had no effect on the privately owned lands, and the owners of those lands were free to use and dispose of them as they saw fit.

"In 1944, at the time the Unit Plan Contract was entered into there were three known 'zones' underlying the Reserve which contain areas that were considered commercially productive of oil and/or gas. These zones are defined in Section 2(c) of the Unit Plan Contract as horizontal strata at various depths between specified geologic markers. Of the three zones only the Shallow Oil Zone and the Stevens Zone contained oil and only the Stevens Zone is directly involved in this action.

"Within the Shallow Oil and Stevens zones are several separate accumulations of hydrocarbons. These underlie both Navy and Standard lands in the Reserve and production from one part thereof could reduce the amount of oil underlying another part, with the result that the Navy's policy of keeping its hydrocarbons in the ground until needed in an emergency could not be effectively implemented if Standard were producing from its land.[2] In the years prior to World War

"[2] This is because, subject to certain limitations, the landowner has the exclusive right to recover all that he can from wells on his land. Hydrocarbons, unlike solid minerals, do not remain in place but move because of changes in underground pressure and would move toward producing wells."

II, Standard and the Navy Department had an understanding to the effect that neither would drill wells inside the Reserve without six months' notice to the other.

"On the threshold of World War II, and with the threat of condemnation, active negotiations began either for an exchange, purchase or condemnation of Standard's land in the Reserve on the one hand, or their operation as a unit with Navy land. A purchase or exchange would have required substantial expenditure by the Government. As an alternative arrangement that would accomplish the Government's purpose of keeping its

hydrocarbons safely in the ground without a substantial payment for acquisition of Standard's lands and without having to worry about the value of the land, the Navy Department and Standard agreed to operate within the Reserve as a unit and on June 19, 1944, entered into the Unit Plan Contract.[3]

"[3] The parties had entered into an earlier contract in 1942, but in 1943, the Attorney General expressed doubts as to its legality. It was voluntarily terminated by the parties. Congress passed enabling legislation (now 10 U.S.C. § 7426) and the Unit Plan Contract was entered pursuant thereto. The earlier contract is now of historical interest only, but it is the reason why the date of November 20, 1942, is the reference date in the Unit Plan Contract for establishing the respective percentage interests of the parties."

*"Unit Plan Contract of June 19, 1944*

"A unit agreement was at that time and still is a common arrangement in the petroleum industry where two or more owners have interests in a common pool. Under such an arrangement, the pool is operated as a unit and the parties share production and costs in agreed-upon proportions. Such an arrangement is usually for the life of the field, and the parties have the same objective, i. e., to produce currently, at minimum expense and pursuant to good engineering practices. This eliminates the necessity and the incentive for each of the parties separately to produce as fast as it can in order to be sure that it receives at least its share of the pool, a practice that would be uneconomic and for engineering reasons could result in a lesser aggregate amount of production from the pool.

"The Unit Plan Contract here involved, however, is unusual because its purpose was not to produce currently, and its effect was to conserve as much of the hydrocarbons in place as was feasible until needed for an emergency.[4] This re-

"[4] See Section 7422 of Title 10 of the United States Code."

quired curtailing production of Standard's hydrocarbons along with that of Navy, for which Standard would have to receive compensation. Accordingly, the parties agreed that in consideration for Standard curtailing its production plus

giving up certain other rights, Standard would be allowed to take up to 25,000,000 barrels of Shallow Oil Zone oil or until it had taken one-third of its participating percentage Shallow Oil Zone oil, whichever was less.[4a] The period during which

[4a] Section 5(d) of the Unit Plan Contract should be referred to for the exact terms."

Standard was receiving this Shallow Oil Zone oil is referred to in the Unit Plan Contract as the 'primary period.' After the primary period, production was to stop, except to the extent necessary to cover Standard's out-of-pocket expenses in connection with operating the Reserve (Unit Plan Contract section 5(f)) and except for production for the purpose of protecting, conserving, maintaining or testing the Reserve (Unit Plan Contract, Recital (8)). Provision was also made for exploration and for the drilling, equipping and maintenance of wells in the Reserve so that it could be produced upon short notice in the event of an emergency.

"All exploration, prospecting, developing and producing operations on the Reserve were placed under the supervision and direction of an Operating Committee comprised of two petroleum engineers, one each to be appointed by and represent Standard and the Navy (Unit Plan Contract, section 3(b)). In order to provide technical advice and make certain specified determinations based upon petroleum engineering data, an Engineering Committee was also established, consisting of the members of the Operating Committee ex officio and four other petroleum engineers or geologists, two to be appointed by and to represent Navy, and two, Standard (Unit Plan Contract, section 2(a)(3)). In the event that either Committee failed to agree in the performance of its functions, the Secretary of the Navy was empowered to make the decision (Unit Plan Contract, section 9)."

## FIRST CLAIM

Disposition of the first claim depends to a great extent upon the application of the contractual provisions to undisputed facts. The parties stipulated to these facts as follows:

"The First Claim involves the question whether Navy is correct in contending that certain lands must be included in the unit under Part II, Section 4(d) of the A and S Agreement (hereinafter sometimes called 'section 4(d)').[5] Navy further contends that

[5] The lands involved are the northwest quarter section of Section 25Z and the southeast quarter section of Section 23Z, owned by Standard and the northeast quarter of Section 26Z owned by Navy, in Township 30 South, Range 22 East, M.D.B. & M. See also map which is Exhibit A to the A and S Agreement."

if this is not a correct interpretation of that agreement the lands within the 'proposed extended area' within the estimated limiting line of commercial productivity drawn by the Engineering Committee may be included, in the discretion of Navy, within the terms of the Unit Plan Contract under section 15(b); and that Navy has exercised this discretion by finding the inclusion of these lands to be desirable. If Navy's contention is correct, the First Claim raises the question whether the parties shall bear their own costs of exploration and development of these lands, or whether those costs shall be borne by the parties in accordance with the terms of the A and S Agreement, or whether this is a matter still open for decision by the parties within the provisions of section 15(b) of the Unit Plan Contract.

"Standard contends that the lands are includible, if at all, only under the procedure provided in section 15(b) of the Unit Plan Contract (hereinafter sometimes called 'section 15(b)'), and that, in any event, Navy is not entitled to shift a portion of its costs of exploration and development to Standard, but that the parties should bear their own costs spent in developing these lands.

### "Background

"Under section 15(b) of the Unit Plan Contract, it was 'contemplated that it may hereafter be desirable to include under the terms of this contract other lands located outside of the present [1944] limits of the

Reserve but which lie on the same geologic structure underlying the present [1944] limits of the Reserve.' Section 15(b) provides that in such situation Standard and Navy will endeavor to agree upon terms and conditions for inclusion. In the event the parties cannot agree the Secretary of the Navy shall decide such terms and conditions on a fair and equitable basis for inclusion.

### "Amendatory and Supplemental Agreement of December 22, 1948

"The Unit Plan Contract provided a method whereby Navy and Standard could explore lands within the Reserve (section 4(c) of the Unit Plan Contract) but no method was provided for exploration outside the Reserve. After the Unit Plan Contract was entered into, exploration within the Reserve showed that part of a Stevens Zone pool extended outside the Reserve. Inasmuch as there was no provision in the Unit Plan Contract for the parties jointly to conduct exploration on lands outside the Unit Area, they entered into Part II of the A and S Agreement, 'in order to determine the exact and ultimate extent of such structure or structures, [then productive within the Reserve and extending into the proposed extended area] and herein provide a program for drilling and testing certain exploratory wells on both Government lands and Standard lands outside the Reserve with a view to the inclusion of all of such structure or structures [down to and including the Stevens Zone] under the Unit Plan Contract' (A and S Agreement, Recital 7).[6]

> "[6] Part I of the A and S Agreement contains amendments to the Unit Plan Contract; Part II contains the provisions for an exploratory program and possible inclusion of lands which the Navy seeks to invoke herein."

"In 1949, two wells were drilled in the Stevens Zone pursuant to the exploratory program provided for in Part II of the A and S Agreement where the parties thought the Stevens Zone pool extended outside the Reserve. After evaluation of the results of these wells, the Engineering Committee in 1956 determined that the estimated limiting line of commercial productivity of the Stevens Zone extended into a part of the southeast quarter of Section 14Z, adjacent to the two parcels of Standard lands, portions of sections 13Z and 23Z, that had already been included in the Unit in 1948 by section 4(a) of Part II. Accordingly, the estimated limiting line of commercial productivity was redrawn in 1956 and that part of Section 14Z within such limiting line was included under the Unit Plan Contract. No other wells have been drilled pursuant to the exploratory program provided for under Sections 1, 2, and 3, Part II of the A and S Agreement. The 1956 estimated limiting line of commercial productivity lies entirely within the present boundaries of the Reserve, and does not include the lands which Navy seeks to bring into the Reserve under its First Claim. The respective participating percentages of the parties were revised in 1957 in response to the redrawing of the estimated limiting line of commercial productivity in 1956. The participating percentages of the parties have not been revised since that time.

### "The Asphalto Field and the Genesis of the Present Controversy Over Inclusion of Land

"In 1962 a new field, the Asphalto Field, was discovered by a third party in the western half of Section 23Z in the Stevens Zone almost one mile west of the Unit boundary. After the Asphalto Field was developed, it was found to run in an approximately westeast direction roughly paralleling the boundary of the Unit area. The lands the Navy seeks by this action to bring under the Unit Plan Contract are an eastern portion of the Asphalto Field and the land which lies between that portion of the Asphalto Field and Section 24Z which is within the Unit. The lands in particular are the northwest quarter section of Section 25Z and the southeast quarter section of Section 23Z, owned by Standard, and the northeast quarter of Section 26Z, owned by Navy, to the extent, if any, that those lands be within an estimated limiting line of commercial productivity of the Stevens Zone.

"In the course of the development of the Asphalto Field, Navy drilled 15 wells in the

northeast quarter of Section 26Z and Standard drilled three wells in the northwest quarter of Section 25Z, and one well in the southeast quarter of Section 23Z, all in the 'proposed extended area' as defined in the A and S Agreement (Recital 4). These wells were drilled and paid for separately by Navy or Standard, each acting independently on its own lands. Neither Navy nor Standard suggested that any of those wells should be drilled under Part II of the A and S Agreement. The location, order of drilling and depth of each well was not determined by the Operating Committee nor approved by the Engineering Committee. Every decision with respect to the drilling and operation of those wells was made by Navy or Standard alone.

"Navy did not ask Standard to conduct the drilling of any wells on Navy's lands in the Asphalto Field. Instead, Navy contracted with another oil company to be the operator, under which contract it paid, in addition to actual cost, an operating fee.

"The Navy land in the northeast quarter of Section 26Z and Standard's lands in the northwest quarter of Section 25Z are an integral part of the Asphalto Field. Those lands have been produced, and third parties are producing their lands in other portions of the Asphalto Field.

"In 1965, a drop in the well pressures of Stevens Zone wells in Section 24Z within the Reserve indicated that there could be a connection between Section 24Z and the Asphalto Field.[7] In response to the drop in

"[7] A connection between the 24Z pool and the Asphalto pool does not necessarily mean that there is an oil connection. A pressure response could be caused by a water connection, and in the instant case, Standard contends that 24Z and Asphalto are connected by water only."

the well pressures in Section 24Z, a computer simulation study was authorized by the Operating Committee and completed in 1965. [Court's note: In November 1965, the Engineering Committee, in response to questions from the Operating Committee, concluded that oil was draining from 24Z into the Asphalto Field. However, when asked whether any of Navy's or Standard's wells in Asphalto were producing from a pool productive within 24Z in the Reserve, in 1948, only Navy's three Committee members answered affirmatively. Standard's three members were undecided.]

"Under date of October 25, 1965, Navy and Standard entered into the West End Injection Agreement, Nod. 9783, in the recitals of which it is noted that the Navy and Standard engineers agreed that there had been a pressure decline in wells in the Stevens Zone in Section 24Z and that this might indicate a fluid migration toward the south and southwest, and that the pressure decline possibly could be arrested by the injection of water in Section 24Z where it abuts upon the Asphalto Field. This agreement was approved by President Johnson on January 19, 1966. Accordingly, a water injection program was initiated. In November 1968, the Engineering Committee agreed that between 1966 and 1968 the goal of the West End Water Injection Agreement of restoring reservoir pressures at the oil-water contact was being accomplished, i. e., that pressures in the southwesterly portion of Section 24Z had been restored to the calculated pressures existing before Asphalto production started, and migration of oil in the 24Z area into the water sands was eliminated or minimized and that increased injection was not required at that time since it appeared that within accuracy of pressure measurements migration of oil into the aquifer from Section 24Z essentially was not occurring. The Engineering Committee confirmed these conclusions in May 1969. The Engineering Committee is still studying the possibility of other oil migration from Unit lands to the Asphalto field, as for example, through the oil band as distinguished from the water sands.

"On February 23, 1966, the Operating Committee requested an advisory opinion of the Engineering Committee, pursuant to section 3(c) of the Unit Plan Contract (A and S Agreement, Part I, sec. 2), as to where the estimated limiting line of commercial productivity would be drawn in the area here in question, based upon the data then available. In response, on February 24, 1966, the Engineering Committee made

its determination of what it denominated as the Estimated Limiting Line of Commercial Productivity in Sections 23Z, 24Z, 25Z and 26Z."

### I.

Navy's principal contention is that the November 1965 and February 1966 determinations of the Engineering Committee require the inclusion of additional lands within the Reserve under the provisions of section 4 of Part II of the A and S Agreement.[1]

Section 4, in pertinent part, reads as follows:

"(b) Promptly after the completion of each exploratory well drilled under Part II of this agreement, the Engineering Committee shall, if said well is commercially productive of oil, gas and/or associated hydrocarbons, determine whether such well produces from any structure or structures now productive within the present boundaries of the Reserve; and if its determination is in the affirmative, the Engineering Committee promptly thereafter shall also determine the extension of the estimated limiting line of commercial productivity of such structure or structures.

"(c) At the time it determines the estimated limiting line of commercial productivity of any structure in accordance with paragraph (b) above, the Engineering Committee shall also determine whether further exploration is necessary in order to obtain adequate information concerning the ultimate extent therein of such structure, and if its determination is in the affirmative, the Operating Committee shall designate the proper location or locations for the next well or wells to be drilled.

"(d) Thereafter there shall be included under the Unit Plan Contract, and under the Operating Agreement, such addition-al Standard lands and such Government lands, down to and including the Stevens Zone, as may be included within said extended limiting line or lines of commercial· productivity, and as may be necessary to encompass therewith in one parcel the drilling sites designated by the Operating Committee pursuant to paragraph (c) above (contingent upon said Government lands being included within the Reserve). Such of said lands as lie within the proposed extended area shall be included under the Unit Plan Contract, down to and including the Stevens Zone, upon the terms and conditions, including the consideration to Standard, spelled out herein;

.   .   ."

Although section 1 of Part II of the A & S Agreement provides for a joint exploratory program, we think that the intent of the parties would be frustrated by a contractual interpretation making such joint exploration a prerequisite to expansion of the Reserve. Since independent exploration is a continuous activity on the part of both Navy and Standard, resulting in much readily available data, it would be impractical to limit the Engineering Committee under section 4 to decisions based on joint exploration data.

■ However, section 4(d) mandates the addition of lands to the Reserve only after certain prescribed steps have been taken. Among these is the requirement of section 4(b) that the Engineering Committee determine whether the wells in the proposed extended area produced oil from a structure productive within the Reserve in December 1948.

At its November 1965 meeting, the Engineering Committee answered questions put to it by the Operating Committee as follows:

4(a). Do any of the wells of Standard in Sections 23Z and 25Z or any of the wells of Navy in Section 26Z produce

---

1. In our disposition of this claim, we assume, without deciding, that: (1) the parties did not avoid the applicability of section 4 by submitting the issue of redrawing the estimated limiting line of commercial productivity to the Engineering Committee under section 3(c) of the UPC; (2) the Engineering Committee determinations were binding on the parties under the terms of the contracts and the Wunderlich Act, 41 U.S.C. § 321.

from any oil pool or pools now productive within Section 24Z [within the Reserve]? Yes.

4(b). Do any of them produce from any pool or pools known to be productive in Section 24Z in 1948? Yes by Navy's members of Engineering Committee. Standard members of the Engineering Committee submitted the following answer:

Geological, stratigraphic and reservoir information do not necessarily indicate that the Asphalto pool, which extends into 24Z, is the same pool as that known to be productive in 24Z in 1948. There are reasons to interpret the information as indicating the wells in Sections 23Z, 25Z, & 26Z are in a separate pool from that known to be productive on 24Z in 1948.

Under the terms of the UPC, such determinations by the Engineering Committee must be unanimous. Since the answer to question 4(b) was not unanimous, and the conflict was not resolved by reference to the Secretary of the Navy pursuant to section 9(b) of the UPC, the effect is the same as if the question had not been submitted to the Engineering Committee at all.

We conclude that the disputed land did not become a part of the Reserve pursuant to the section 4 procedure.

## II.

Navy argues that it may include the subject land in the Reserve under section 15(b) of the UPC. Section 15(b) states:

It is contemplated that it may hereafter be desirable to include under the terms of this contract other lands located outside of the present limits of the Reserve but which lie on the same geologic structure underlying the present limits of the Reserve. If and when any such situation shall arise, Navy and Standard will endeavor to agree upon the terms and conditions on which such additional lands may be included under this contract upon the basis of the estimated acre-feet of commercially productive formations in each commercially productive zone underlying such additional lands. If Navy and Standard shall be unable to agree upon the terms and conditions on which such additional lands may be included, the Secretary of the Navy shall decide such terms and conditions upon a fair and equitable basis, and such decision in each such instance shall be final and shall be binding upon Navy and Standard. In determining the estimated acre-feet of commercially productive formation underlying such additional lands, the Secretary shall, at Standard's request or on his own initiative, secure and consider an advisory report from an independent petroleum engineer in the manner provided in paragraph (b) of Section 9.

■ By answering "yes" to the following question posed by the Operating Committee, the Engineering Committee in 1965 unanimously concluded that wells on Standard's land produced from an oil pool on the same geologic structure underlying the limits of the land covered by the 1944 contract: [2]

4(a). Do any of the wells of Standard in Section 23Z and 25Z or any of the wells of Navy in Section 26Z produce from any oil pool or pools now productive

2. The dissent states "to this day there has not been a determination that the lands in question lie on the same geologic structure (i. e., oil pool) underlying the present limits of the field, even though such a determination is a prerequisite to the invoking of section 15(b)." This assertion cannot be reconciled with the conclusions of the Engineering Committee, on which Standard and the Navy had equal representation. In November 1965 the Committee agreed unanimously that there was a drainage of hydrocarbons from the 24Z pool within the Reserve to a pool or pools in the Asphalto Field outside the Reserve. The Committee further unanimously agreed that wells outside the Reserve on the lands in question produced from an oil pool productive within section 24Z.

We do not determine the precise effect this finding should be given (or the extent, if any, to which it may be re-examined in light of more recent data) in administrative processes that may be undertaken under section 15(b) following this decision. Such questions are more appropriately resolved in judicial review of the final administrative decision under section 15(b).

within Section 24Z [within the Reserve]?

Navy contends that since it was thus determined that the lands in question are on the same geologic structure that underlies the Reserve, section 15(b) of UPC permits Navy to add these lands to the Reserve upon Navy's unilateral determination that it is "desirable" to do so.[3] Standard argues that the parties intended a mutual determination of desirability to precede inclusion of outside lands; and asserts that this interpretation is bolstered by the existence of Navy's statutory power of condemnation, 10 U.S.C. § 7425, which allows Navy to expand the Reserve unilaterally if it wishes.

■ We·conclude that the word "desirable" was not intended to limit expansion of the Reserve under section 15(b) of the UPC to those situations in which there was a joint decision to do so; we thus agree with the Navy.

An interpretation of section 15(b) of the UPC which would allow Navy to decide unilaterally to include land on the same geologic structure under the UPC is supported by the language of section 15(b) and by the purpose of the contract as a whole.

The only reference in section 15(b) to agreement between Navy and Standard does not relate to an agreement to the desirability of including additional lands under the contract, but to an agreement to the terms and conditions on which such additional lands would be included. Section 15(b) provides that the parties "will endeavor to agree upon the terms and conditions." It provides further, however, that if the parties fail to agree, "the Secretary of the Navy shall decide such terms and conditions . . . ." Thus, the Secretary is given final authority to settle any difference between the parties as to terms and conditions for inclusion of additional lands. The interpretation urged by Standard would undermine the Navy's explicitly granted authority to impose reasonable terms and conditions by giving Standard power to compel agreement to more favorable terms and conditions by withholding consent on the threshold question of desirability. Although the threat of condemnation would restrain Standard's use of this power, the interpretation here adopted better protects the Navy and simplifies the process of inclusion, clearly major purposes of section 15(b).

The purpose of the contract and the language of other provisions support this construction of section 15(b). Recital (6) of the UPC demonstrates that the central purpose of the contract is to protect the Reserve. It therefore would be "desirable" to include additional lands under the UPC whenever the goal of conserving oil in the Reserve would be furthered by doing so. But the interests of Standard and the Navy with respect to this goal are divergent. The Navy's interest is to conserve oil in the ground; Standard's interest is to produce that oil when it is to Standard's economic advantage to do so. The UPC was drafted with the specific purpose of resolving these conflicting interests in favor of the Navy by enhancing "*Navy's* power to conserve oil in the ground." UPC Recital 6(b) (emphasis added). *See also* Recital 6(d)(i) and section

---

**3.** The dissent contends "the West End Injection Agreement procedure solved any oil migration concern and thus rendered the issue moot," and further appears to argue that under section 15(b) of the UPC and the applicable statutes, Congressional and Presidential approval is required prior to acquisition of lands outside the Reserve, "which are not included in a cooperative or unit plan but receive substantial drainage from the Reserve." Section 15(b), however, is a contractual method of bringing land outside the Reserve under the UPC; it is distinct from acquisition by condemnation, which is controlled by the statutes. The statutes cited by the dissent do not condition section 15(b) of the UPC. Section 15(b) applies to "lands located outside the present limits of the Reserve but which lie on the same geologic structure underlying" the Reserve; there is no requirement of "substantial drainage." In 1965 the Engineering Committee found both that there was drainage from 24Z into the Asphalto Field outside the Reserve and that the outside lands lie on the same geological structure. *See* note 2, *supra.* Even if the water injection project halted drainage of oil from the Reserve by 1968, it would not affect the Committee's unanimous decision that the lands were on the same geologic structure.

1(a). Navy's unilateral power to expand the Reserve is consistent with the resolution of the conflicting interests in favor of protecting the Reserve. The contractual guarantee that the terms be fair and equitable protects Standard.

The mere existence of the statutory power of condemnation under 10 U.S.C. § 7425 does not in itself detract from this interpretation of section 15(b). Congress granted the Secretary the power of condemnation in the same statute in which it authorized the Secretary to enter into unit agreements like the UPC covering lands within and outside the Reserve. 10 U.S.C. § 7426(a). *See* Act of June 17, 1944, 58 Stat. 280, 282. Outright condemnation and unit plan contracts are alternative methods by which Navy may control production from outside lands. Once the UPC was signed, the extension of the Reserve to Standard's lands "which lie on the same geologic structure" is governed by the terms of the contract. On its face the statute appears to contemplate just such contractual substitutes for condemna-

tion, for 10 U.S.C. § 7425 authorizes the Secretary to acquire private lands by purchase or condemnation only when the Secretary "is unable to make arrangements he considers satisfactory for . . . contracts for joint, unit, or other cooperative plans." Inclusion of private lands in a reserve by contract rather than condemnation has advantages for both the Navy and the private owners.[4]

The legislative history of the statute is inconclusive.

While the statute was under consideration, the UPC was being negotiated and was called to the attention of Congress. In its original form, section 15 of the UPC simply provided that the Navy and Standard should endeavor to agree to terms and conditions for inclusion of lands in the Reserve.[5] Dissatisfaction with this language was expressed by at least one congressman and it was intimated that the Secretary should have unilateral power to determine the desirability of bringing additional lands under the UPC.[6] The two final sentences

---

**4.** From the government's point of view, section 15(b) permits lands to be brought within the Reserve *without the expenditure of funds that* would be necessary if the inclusion were accomplished by condemnation under 10 U.S.C. § 7425. Under section 15(b), the parties could agree that Standard would be compensated for the inclusion of Standard land outside the Reserve by allowing Standard to produce a limited quantity of oil from the Shallow Zone, as was done in the A&S Agreement. If the parties could not agree, the Secretary could nonetheless establish this means of compensation as one of the "terms or conditions" for including the outside land under the UPC.

Contractual "condemnation" under section 15(b) also had advantages for Standard. Land brought within the Reserve by this means remained the property of Standard, and could be produced by Standard subject to the limitations of the UPC. Standard's proposed findings of fact, adopted by the district court, state that negotiations leading up to the signing of the UPC were undertaken under "threat of condemnation." Standard apparently wished to avoid losing altogether through outright condemnation its interest in Elk Hills oil within and (as it might develop) outside the Reserve.

**5.** The Reports of both the Senate and House Committees on Naval Affairs on the enabling legislation for unit plan contracts included a January 20, 1944, draft of the Navy-Standard

contract, which contained the following version of section 15:

Section 15. Inclusion of Additional Lands

It is contemplated that it may hereafter be desirable to include under the terms of this contract other lands located outside of the present limits of the Reserve but which lie on the same geologic structure underlying the present limits of the Reserve. If and when any such situation shall arise, Navy and Standard will endeavor to agree upon the terms and conditions on which such additional lands may be included under this contract. Sen.Rep.No.948, 78th Cong., 2d Sess. 19 (1944); H.R.Rep.No.1529, 70th Cong., 2d Sess. 39 (1944).

**6.** In hearings before the House Committee on Public Lands on the proposed contract between the Navy and Standard, Congressman Barrett apparently expressed an objection to the requirement of agreement in section 15 of the January 20, 1944 draft. The following exchange between Congressman Barrett and Commander Stolz of the Naval Petroleum Advisory Board can be read to indicate a concern that the Secretary should have unilateral power to determine the desirability of bringing additional land under the UPC:

MR. BARRETT. In section 15 of the proposed contract, I find this language [reading]:
"It is contemplated that it may hereafter be desirable to include under the terms of this

of section 15(b), which appear to vest this power in the Navy, may have been added to meet this criticism. Nothing in the legislative history explicitly considers why these sentences were added or what they were intended to mean. There is no unambiguous reference in the legislative history either to the intended relationship between section 15(b) and the power of condemnation, or, specifically, to whether the Navy had unilateral power to include Standard's land in the Reserve under the language of section 15(b), as finally agreed to by the parties. This is not surprising, since the final two sentences of section 15(b) were apparently added to the contract after committee hearings and reports on the enabling statute had been completed.[7]

There is no logical inconsistency in making inclusion of Standard's lands subject to Navy's unilateral determination as well as subject to a power of condemnation. The threat of condemnation was a potent bargaining point for the Navy in negotiations for the UPC that were then underway. Moreover, in some circumstances it might be preferable for the Navy to obtain the fee, which could only be accomplished by condemnation.

A primary concern of Congress was that the Navy be provided with an expanded power of condemnation and that this power be limited in ways that would prevent its abuse. But Congress' concern with condemnation does not suggest that Congress tacitly assumed either that the Navy could unilaterally expand the Reserve under the UPC or that Standard and the Navy would have to agree to the inclusion of outside lands. The fear of abuse of condemnation did not arise in connection with the inclusion of additional lands owned by Standard.[8] The various statutory limitations on condemnation also apply to lands around the periphery of the Reserve in which persons who were not in the process of negotiating unit plan contracts had interests.

contract other lands located outside the present limits of the reserve, but which lie on the same geological structure underlying the present limits of the reserve. If and when any such situation may arise, Navy and Standard will endeavor to agree upon terms and conditions on which such additional lands will be included under this contract."

I am not altogether satisfied with the language which states, "Navy and Standard will endeavor to agree upon terms," because it seems to me it ought to be conclusive—that to include the wells in the Stevens zone in the Coles Levee field to be included in the plan should be left with the Navy, instead of to a matter of agreement between Navy and Standard. And I say that, Commander, because I think that the Navy contends that either through condemnation or through this unit plan they propose to conserve the oil in the producing sands for the people of the country. Is that right?

Commander STOLZ. That is correct sir.

MR. BARRETT. Now, it is apparent to me that the purpose of this section is to incorporate the Stevens zone both inside the reserve and outside the reserve into one unit plan for conservation purposes; is that right?

Commander STOLZ. That is correct, sir. Hearings on H.R. 2596 Before the House Comm. on Public Lands, 78th Cong., 1st Sess. 755–56 (1944).

7. Senate Report No. 948 is dated June 5 (legislative day, May 9, 1944) and House Report No. 1529 is dated May 29, 1944. The fact that those two reports did not contain the final version of section 15(b) is strong evidence that the last two sentences, including the provision giving the Navy the power to decide terms and conditions for including Standard lands in the Reserve, were added to section 15(b) during the three weeks before the UPC was signed on June 19, 1944. And because the enabling legislation for the UPC was not passed until two days before the signing of the contract, the last two sentences may have been added to section 15(b) of the contract during the closing days of the struggle to enact the enabling legislation.

8. Standard apparently did not seek the safeguards against unwise use of the power of condemnation. Rather, the record reflects that the safeguards were enacted in response to the protests of the Richfield Oil Company, the Independent Oil Producers' Association, and the Board of Supervisors of Kern County, California. See Sen.Rep.No.948, 78th Cong., 2d Sess. 6–7 (1944). Kern County wanted to discourage condemnation and to encourage unit plan contracts in order to preserve private ownership and thus keep lands on the local tax rolls. Richfield and the Producers' Association were not in the process of negotiating a contract with the Navy. They therefore sought to limit the power of condemnation to protect their interests at Elk Hills.

636

Since the legislative history does not strongly suggest a particular interpretation of section 15(b), we must base our interpretation of this contractual provision on the language and purpose of the contract itself. As we have said, the language and purpose of the contract convinces us that section 15(b) empowered the Navy to extend the reserve to Standard's lands on the same geologic structure when the Navy unilaterally determined that it was "desirable" to do so.

The Secretary of the Navy clearly determined in 1965 and 1966 that it would be desirable to include portions of sections 25Z and 26Z within the Reserve because of the loss of oil discovered by the Engineering Committee. He did not seek to invoke that section because he believed that the lands could be brought under the UPC on terms more advantageous to the United States pursuant to Part II, § 4 of the A&S Agreement. The United States has insisted throughout this litigation that the Secretary should be permitted to invoke section 15(b) if the court decided that the parties had failed to comply with the requirements of the A&S Agreement. The Secretary should at least be given the opportunity to do so now.[8a]

### SECOND AND THIRD CLAIMS

Navy's second and third claims involve the proper allocation of Stevens Zone costs

to Navy and Standard under the UPC for the periods July 1, 1947, to May 8, 1948, and March 13, 1949, to December 1, 1957, respectively. Navy alleges that it made certain overpayments during these periods, and it seeks a money judgment of approximately $500,000 on each claim.

The district court resolved both claims against Navy on the merits. In addition, the court held that Navy was bound by the determinations, adverse to Navy's present position, made by the General Accounting Office (hereinafter "GAO") and the Comptroller General. On appeal, Navy argues (1) that it is not bound by the determinations of the GAO and the Comptroller General, and (2) that the district court's interpretation of the UPC provisions involved in the second claim is inconsistent with its interpretation of the contract in the third claim. Since our disposition of Navy's first contention may obviate the necessity of a review of the merits, we examine it first, after a synopsis of the background.

### I.

Under the terms of the UPC, all oil produced from, and all costs incurred for, each commercially productive zone are to be shared ultimately by Navy and Standard in proportion to their respective "percentage participations" of ownership in such zone. During the life of the contractual relation-

8a. Standard suggests that the lands in question cannot be brought under the unit contract through section 15(b) because of the district court's finding that these lands "are not on the same geologic structure underlying the present Units of the Reserve within the meaning of section 15(b)." Finding 45. As originally filed, our opinion included a holding that Finding 45 was clearly erroneous. Upon further consideration inspired by Standard's petition for rehearing and Navy's response, we have concluded that this finding and the subsidiary findings on which it is based (Findings 39–45) should be vacated upon another ground.

A determination that the lands Navy seeks to have included in the reserve through section 15(b) lie on the same geologic structure underlying the limits of the reserve as it existed in 1944 is an integral step in the administrative process authored by section 15(b). It is a part of the contractual bargain between Navy and

Standard that this determination be made initially through the administrative process. The problem is technical and complex and the expertise developed among those involved in the administration of UPC may contribute to its proper resolution. It is well established principle, applicable here, that where parties have contracted for an administrative determination of factual issues the court should respect the agreement of the parties and refrain from usurping the administrative function. *See, e. g., United States v. Anthony Grace & Sons, Inc.,* 384 U.S. 424, 428–32, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); *Bethlehem Steel Corp. v. Grace Line, Inc.,* 135 U.S.App.D.C. 81, 416 F.2d 1096, 1106–08 (1969). As the latter case reflects, the principle applies even where, as here, resolution of the factual issue will determine whether the merits of the dispute are subject to the administrative process. 416 F.2d at 1108.

ship, the parties share production and costs under various UPC provisions which are designed to apportion production and expenses in such a manner that the parties stay roughly in balance with respect to the ultimate percentage participations.

In 1951 a question arose as to the proper interpretation of the two cost sharing provisions of the UPC involved in the instant case, sections 6(b)(1)(iv) and 6(b)(1)(v). The parties discussed the problem and agreed upon an interpretation, which they then followed. In 1963 the Navy resurrected the same issues of contractual interpretation, alleging that it had made overpayments of interim costs, and it submitted the problem to the Comptroller General.[9] In 1964 the Comptroller General approved the 1951 settlement agreed to by the parties. In 1967 the Navy filed this lawsuit.

## II.

The GAO is independent of the executive departments and under the control and direction of the Comptroller General. 31 U.S.C. § 41. It is provided in 31 U.S.C. § 71 that:

> "All claims and demands whatever by the Government of the United States or against it, and all accounts whatever in which the Government of the United States is concerned, either as debtor or creditor, shall be settled and adjusted in the General Accounting Office."

According to 31 U.S.C. § 72 (Fourth), the GAO

> " . . . shall receive and examine all accounts of salaries and incidental expenses of the office of the Secretary of

the Navy, and of all bureaus and offices under his direction, all accounts relating to the Naval Establishment, Marine Corps, Naval Academy, and to all other business within the jurisdiction of the Department of the Navy, and certify the balances arising thereon to the Secretary of the Navy."

The effect of such certification is stated in 31 U.S.C. § 74:

> "Balances certified by the General Accounting Office, upon the settlement of public accounts, shall be final and conclusive upon the Executive Branch of the Government, except that any person whose accounts may have been settled, the head of the Executive Department, or of the board, commission, or establishment not under the jurisdiction of an Executive Department, to which the account pertains, or the Comptroller General of the United States, may, within a year, obtain a revision of the said account by the Comptroller General of the United States, whose decision upon such revision shall be final and conclusive upon the Executive Branch of the Government. . . . ."

Navy argues that section 74 is intended solely to protect federal certifying and disbursing officers from liability for mismanagement of public funds,[10] and that GAO determinations bind the Government only so long as it abstains from litigation. However, even though promotion of inter-executive department harmony and protection of federal officials may be aims of section 74,[11] the present language of the statute is too broad to permit such a narrow interpreta-

---

**9.** Since this was almost six years after the close of the period involved in the third claim, it is questionable whether the Comptroller General possessed any review power. *Compare* 31 U.S.C. § 71 *with* 31 U.S.C. § 74. However, Standard cooperated with Navy in briefing and arguing the issues to the Comptroller General.

It is interesting to note that the Judge Advocate General, in a July 1, 1963 letter to the Director of Naval Petroleum Reserves, stated:

[I]t is recommended that the subject matter be referred to the Comptroller General of the

United States for his opinion. The views of the Comptroller General would be controlling upon the Navy.

**10.** *See* 31 U.S.C. §§ 82b–82d, 505.

**11.** *See* Cibinic & Laskin, *The Comptroller General and Government Contracts,* 38 Geo.Wash. L.Rev. 349, 352–62 (1970).

tion.[12] No case allowing such a lawsuit has come to our attention.[13]

■ Section 74, then, acts as a statutory estoppel upon the Government. Certification of accounts by the GAO, or timely revision by the Comptroller, binds the Government in a subsequent lawsuit. Navy asserts that this interpretation will allow Comptroller General determinations to bind the judiciary, a result not suggested by the statutory language. However, it seems clear that a dissatisfied private contractor can challenge GAO and Comptroller General determinations in court, and these determinations do not control the judicial disposition. Section 74 enables the private contractor who obtains a favorable resolution from the Comptroller General to avoid the possibility of years of litigation resulting from intra-Governmental disagreement.

Navy voices concern that the Government may be barred from collecting mistaken overpayments. If the GAO certifies mistaken overpayments, the Government has one year within which to call the mistakes to the attention of the Comptroller General. This one-year limitation is not unreasonable; it ensures the effectiveness of section 74 as a swift-acting quietus for many public contract disputes.

■ All accounts of Navy for the periods involved in these claims were reviewed and certified by the GAO. Navy did not seek review of any of the disputed accounts within one year of their certification.

Therefore, pursuant to the plain language of the statute, the GAO certification of these balances is binding upon Navy.

Without reaching the merits of the UPC interpretation dispute, we affirm the district court as to the second and third claims since Navy is barred by statutory estoppel.

Affirmed in part, reversed in part, and remanded for entry of judgment consistent with this opinion.

MORELL E. SHARP, District Judge (concurring in part and dissenting in part):

I concur with the majority's affirmance of the second and third claims and with its conclusion that Section 4 of the A & S Agreement is inapplicable to the first claim, but I disagree with its conclusion that the lands in question may be included in the Reserve under Section 15(b) of the Unit Plan Contract.

The question is one of contract interpretation. Section 15(b) of the U.P.C. provides that

"It is contemplated that it may hereafter be desirable to include under the terms of this contract other lands located outside of the present limits of the Reserve but which lie on the same geologic structure underlying the present limits of the Reserve. . . ."

This is interpreted by the majority as if it read:

"It is contemplated that Navy may hereafter include . . . ."

I can find nothing in the contract language, or in the language and legislative history of

---

12. A precursor of 31 U.S.C. § 74, the Act of March 30, 1868, ch. 36, 15 Stat. 54, stated:

"That the act of March three, eighteen hundred and seventeen, entitled 'An Act to provide for the prompt settlement of public accounts,' shall not be construed to authorize the heads of department to change or modify the balances that may be certified to them by the commissioner of customs or the comptroller of the treasury, but that such balances, when stated by the auditor and properly certified by the comptroller as provided by that act, shall be taken and considered as final and conclusive upon the executive branch of the government, *and be subject to revision only by Congress or the proper courts.* . . ." (Emphasis added)

Significantly, the italicized language does not appear in the present statute.

13. Mansfield, in his comprehensive study of the Comptroller General, states:

"Judicial review of the Comptroller General's acts may be invoked in three different ways: (1) by a suit to recover a disallowed payment from the disbursing officer or his surety, or from the payee; (2) by a suit in the Court of Claims to secure a payment withheld at the behest of the Comptroller General, or to recover a disallowance previously refunded; or (3) by a suit for mandamus or mandatory injunction to compel the payment of a sum claimed to be due. Only the first of these is initiated by the government. In all of them the Comptroller General is reversed only if the government loses the suit, and not necessarily then."

H. Mansfield, *The Comptroller General* 106–07 (1939).

the enabling statute, 10 U.S.C.A. § 7426, which justifies rewriting the contract to this extent.

The apparent rationale for the majority's interpretation is the parties' conflict of interests: Standard's interest is to produce oil when it is to Standard's economic advantage to do so, while Navy's interest is to conserve oil in the ground. The existence of such divergent interests hardly provides an appropriate basis for ignoring the language agreed on by the parties. Phrases such as "Navy and Standard shall, . . ."; "the ownership interests of Navy and Standard, respectively, . . ."; "either Navy or Standard may at any time . . ."; "if either Navy or Standard desires at any time . . ."; "Standard shall be permitted to receive . . ."; "if, at any time, Navy shall elect . . ."; "Navy (subject to applicable law) and Standard shall each have . . .", are used throughout the contract to express the respective rights, duties and responsibilities of the parties. It is inconceivable to me that the parties intended the language used in Section 15(b) to establish a kind of unilateral contractual "condemnation" in favor of Navy and against Standard, particularly in a contract which, as Navy states in its brief to this Court, was "the product of hard bargaining by Navy and Standard."

The result the Court reaches is ironic. As noted in the agreed facts recited in the majority opinion, the parties agreed in October 1965 that there was a pressure decline in the wells in the Reserve, indicating a possible migration from the Reserve. The Engineering Committee was unable to determine the boundary or size of the pool allegedly receiving the migrating oil. In fact, to this day there has not been a determination that the lands in question lie on the same geologic structure (i. e., oil pool) underlying the present limits of the field, even though such a determination is a prerequisite to the invoking of the Section 15(b) procedure. Nevertheless, because of the uncertainty in 1965, Standard stated its willingness at that time to place its adjacent lands under unit plan control pursuant to Section 15(b), with the terms and conditions to be negotiated. Navy rejected this offer, however, asserting that Navy was not empowered to negotiate under Section 15(b) and that, in any event, the land should be included under the A & S Agreement.

The reluctance of the Secretary of the Navy to proceed under Section 15(b) is understandable in light of the applicable statutes. 10 U.S.C.A. §§ 7425 and 7426 require Congressional and Presidential approval prior to acquisition of lands outside of the Reserve, which are not included in a cooperative or unit plan but receive substantial drainage from the Reserve.[1] Furthermore, assuming the necessary statutory approvals are obtained and requirements met, Section 15(b) requires that new terms and conditions be negotiated by the parties. On the other hand, no additional statutory approvals are necessary to include outside lands qualifying under the terms of the A & S Agreement, and the terms and conditions of inclusion would be covered by adjusting the percentage formula previously agreed upon in the A & S Agreement.

1. One of the more startling conclusions reached by the Court is that acquisition of lands outside the Reserve under the Section 15(b) procedure does not require Congressional and Presidential approval (see footnote 3, majority opinion). But the A & S Agreement itself was executed by the parties to cover a Section 15(b) expansion. Its recitals state, in part, that:

"Pursuant to statute, Navy and Standard recently consulted the Special Subcommittee on Petroleum, Committee on Armed Services, House of Representatives, United States Congress, with regard to the proposed extension of the boundaries of the Reserve. The Subcommittee decided to defer further consultation thereon until after the parties hereto should have determined definitely, by drilling additional exploratory wells within the Reserve, whether any pool of oil or geologic structure now productive within the present boundaries of the Reserve extends beyond said boundaries and outside of the Reserve."

The A & S Agreement also stated that it would become effective when approved by the President of the United States, and, in fact, it does bear the signature of President Truman approving its execution. This Court has now declared that these statutory approvals are unnecessary.

While this controversy continued by means of correspondence between the parties, the West End Injection Agreement procedure solved any oil migration concern and thus rendered the issue moot. As noted in the agreed statement of facts, pressure was restored sometime between 1966 and 1968, and any migration of oil eliminated or minimized. Thereafter, Standard declined to agree to the inclusion of its lands and suit followed.[2]

In my opinion, the court's decision disregards the entire contractual and statutory scheme established to protect this Reserve. In holding that the Navy may, and did, unilaterally determine desirability, the court is also holding that the Navy may unilaterally determine whether the desired land lies on the same geologic structure underlying the present limits of the Reserve, may unilaterally determine that there is substantial drainage from the Reserve, and may unilaterally determine the extent of the land to be concluded. Such a "contractual condemnation" not only eliminates a large part of the contract detailing precise engineering procedures for reaching these determinations, it also ignores the requirements of the statute. 10 U.S.C.A. § 7425 provides that in the event the Secretary of the Navy is unable to satisfactorily conclude a contractual relationship with respect to lands outside the Reserve:

". . . he [the Secretary of the Navy] may acquire, with approval of the President, such privately owned lands and leases—

(1) by purchase . . . outside those reserves on the same geologic structure; and

(2) by condemnation . . . if there is substantial drainage, outside that reserve on the same geologic structure."

The Unit Plan Contract with Standard Oil Company was before both houses of Congress in 1944 at the time the Act was amended to its present form, and it should be interpreted within the context of the legislative history of those amendments.[3]

Prior to the amendments, the Act only authorized purchase or condemnation of privately owned lands within the boundaries of the Reserve. The amendments, however, enlarged the authority to provide that:

"In the case of the authority to condemn, the bill extends it to include privately owned lands or leases outside reserve No. 1 but on the same geologic structure provided that drainage exists." H.R.Rep.No.1529, 78th Cong., 2d Sess. 15 (1944).

Congress was concerned with the possible abuse of condemnation power by Navy. Originally, the House bill authorized condemnation outside the Reserve but on the same geologic structure, provided that drainage existed. The Senate was concerned with this grant of power and amended the bill to provide that "substantial drainage" must exist prior to condemnation.

"It will be noted that he is authorized to acquire private lands on all oil reserves

2. Standard nonetheless proposed by letter dated February 23, 1968 that Navy agree to submit to the Engineering Committee the question of whether there is "appreciable loss of oil in or from the 24Z pool in the Reserve at the present time." Standard offered:

"If a majority of the engineering committee answers question No. 2 'yes'—or even if the three Navy members of the committee, including the engineering outside consultants of Navy referred to above, all answer question No. 2 'yes'—we will again offer to include all lands in question under the unit plan contract under Section 15(b) thereof or, if this is still unacceptable to Navy, under some other mutually agreeable mechanism."

Navy declined the offer.

3. The majority opinion finds it significant that the parties added the last two sentences to Section 15(b) before its final execution, and speculates that they were added to clarify the unilateral right of Navy to contractually condemn Standard's lands outside of the Reserve. But speculation isn't necessary when language is clear. I read the additional sentences as merely setting forth a means to break a deadlock occurring when the parties have found expansion desirable but are unable to agree on the terms and conditions for including the additional lands.

or outside thereof but on the same geologic structure, by purchase—

'and (b) within Naval Petroleum Reserve No. 1 by condemnation, and (c) outside Naval Petroleum Reserve No. 1 but on the same geologic structure, provided that substantial drainage exists, by condemnation.'

"This provision was somewhat controverted because of a fear that the Department might seek to condemn holdings of privately owned companies outside the naval reserve, so the Naval Affairs Committee of the Senate—and afterward the House accepted the amendment—provided that 'substantial' drainage must exist." 90 Cong.Rec. 5774 (1944) (Remarks of Sen. Walsh of Massachusetts).

As Senator Walsh also stated:

"They must in the condemnation proceedings prove that the oil is being drained in order to have the court condemn the property—

'and not merely to those which are on the same geologic structure.' " *Id.* at 5778 (Reading from Navy Dept. Memorandum).

And also:

"Mr. MOORE. As I understand—and I want to see if I am correct—the Government cannot condemn the property of private oil companies or private individuals until there is an allegation of drainage and the allegation is afforded an opportunity to be heard before the committees of Congress. Am I correct about that?

"Mr. WALSH of Massachusetts. The Senator is absolutely correct." *Id.* at 5777.

In addition to requiring substantial drainage, Congress was careful to limit the power of condemnation solely to protect the present reserve. As noted in the report of the Senate Committee on Naval Affairs accompanying the amending bill:

"In the opinion of the committee, the bill provides sufficient safeguards against the unwise use of the Navy's authority to condemn such lands. It has been, and will undoubtedly continue to be, the policy of the Government not to condemn or acquire privately owned oil lands for the purpose of establishing additional reserves for the Navy, unless such acquisition is necessary to protect the oil in the lands that the Navy now controls." Sen. Rep.No.948, 78th Cong., 2d Sess. 7 (1944).

And, as made clear by Congressman Vinson of the House Committee on Naval Affairs in his remarks to the full House:

"Further, before any condemnation proceedings can be instituted the Secretary must consult with the Naval Affairs Committee of the Congress. This will insure that the Secretary will have adequate powers to deal with the draining of Government oil by private operators and at the same time will prevent an extension of the reserve beyond the limits required for protection of what we now have." 90 Cong.Rec. 5194 (1944).

And, again, by Congressman Vinson:

"Mr. Chairman, I know of no case in which the power of condemnation has been granted to the executive branch of the Government, in which so many safeguards have been created to insure that the power would not be irresponsibly used.

"Let me say that we seek no additions to the Elk Hills reserve; all we seek is the protection of that which we have. I repeat that the experts of the Navy Department have advised the committee that the power is needed to protect what we have." *Id.* at 5196.

In testifying before the Senate Naval Affairs Committee, Congressman Vinson made it clear that the limitation on the power of the Navy to condemn applied to Standard's lands as well as to others.

"Before we can condemn the Standard's lands, you, a member of this committee, and the others must be notified." Hearings on S. 1773 before the Senate Naval Affairs Committee, 78th Cong., 2d Sess. at 23 (1944).

The facts in this case demonstrate the illogic of the majority's conclusion. It is

undisputed that since at least 1965 third parties have been (and presumably still are) producing from the Asphalto pool. If the real purpose of including Standard's lands is to protect the Reserve from "substantial drainage," Navy will have to add these third-party lands to the Reserve by negotiating with the owners for inclusion in the Unit Plan Contract, or by purchase or condemnation—satisfying the requirements of the statute.[4] Under this Court's decision, however, Navy will acquire Standard's lands without condemnation or purchase compensation and without satisfying any of the requirements of the statute.

The irony of this situation is that the Navy can no more meet these statutory requirements today than it could in 1965 or 1966, particularly in view of the admittedly successful West End injection program. And this, of course, leads to an additional concern. The Court's decision leaves unanswered the question of whether it is a declaration that the "contractual condemnation" took place in 1965 or 1966 or whether it is to take place upon remand. Either way, Navy will be acquiring control of Standard's lands and enlarging the Reserve in a manner contrary to the contract and the will of Congress.

For these reasons, I dissent.

---

4. Substantial drainage from the Reserve by third-party production outside of the Reserve would obviously concern Standard as well as Navy. In that event, Standard and Navy would find it "desirable" to include these third-party lands, and the Section 15(b) procedure for determining the terms and conditions on which such additional lands would be included, would be utilized.