**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**STANDARD OIL COMPANY OF CALIFORNIA, a corporation,**
**Defendant-Appellant.**

No. 78–1565.

United States Court of Appeals,
Ninth Circuit.

Jan. 24, 1980.

Larry A. Boggs, Dept. of Justice, Washington, D. C., argued for defendant-appellant; Dirk D. Snel, U. S. Dept. of Justice, Washington, D. C., on the brief.

Robert M. Westberg, San Francisco, Cal., argued for plaintiff-appellee; Turner H. McBaine, San Francisco, Cal., on the brief.

Before WALLACE and KENNEDY, Circuit Judges, and WILLIAMS,* District Judge.

WALLACE, Circuit Judge:

Standard Oil Co. of California (Standard) appeals from the district court's award of summary judgment to the United States, in litigation involving the Navy's and Standard's unit operation of the Elk Hills Naval Petroleum Reserve. The matters in controversy are: (1) whether the Acting Secretary of the Navy exceeded his statutory authority, or misinterpreted relevant unit plan contract (UPC) provisions, by determining that certain land owned by Standard (called section "7R"), located outside the Elk Hills Reserve but adjoining it to the north, was properly included within the Unit; and (2) whether the Acting Secretary's determination of "fair and equitable" terms and conditions for such inclusion was consistent with certain statutory and contractual provisions. The district court awarded summary judgment in favor of the United States on both issues. We affirm in part and reverse and remand in part.

I.

The complicated history of the origin, development, and operation of the Elk Hills Reserve is set forth in *United States v. Standard Oil Co. (Asphalto )*, 545 F.2d 624,

---

* Honorable Spencer Williams, United States District Judge, Northern District of California, sitting by designation.

626–28 (9th Cir. 1976) (per curiam).[1] Therefore, we set forth only those facts crucial to resolution of the matter before us.

The Act of June 17, 1944, 58 Stat. 280, later reenacted and codified as 10 U.S.C. § 7426, empowers the Secretary of the Navy to enter into petroleum unit plan contracts for the protection of the Elk Hills Reserve. It stated at all times relevant herein:[2]

> (a) The Secretary of the Navy may contract for joint, unit, or other cooperative plans of exploration, prospecting, conservation, development, use, and operation of lands owned or controlled by the United States inside naval petroleum reserve numbered 1 [the Elk Hills Reserve] and lands owned or leased by private interests—
>
> (1) inside naval petroleum reserve numbered 1; or
>
> (2) outside naval petroleum reserve numbered 1 on the *same geologic structure.*

10 U.S.C. § 7426(a). (Emphasis supplied.) This statute was passed specifically to enable the Secretary of the Navy to enter into the instant unit plan contract with Standard. *See Asphalto, supra*, 545 F.2d at 627. The UPC was executed in 1944, and amended in 1948 by the "Amendatory and Supplementary Agreement" (A & S agreement).

The relevant UPC provisions are sections 15(b) and 2(a)(5). The latter was added by the A & S agreement in 1948. Section 15(b) states:

> It is contemplated that it may hereafter be desirable to include under the terms of this contract other lands located outside of the present limits of the Reserve but which lie on the *same geologic structure*

underlying the present limits of the Reserve. If and when any such situation shall arise, Navy and Standard will endeavor to agree upon the terms and conditions on which such additional lands may be included under this contract . . . . If Navy and Standard shall be unable to agree upon the terms and conditions on which such additional lands may be included, the Secretary of the Navy shall decide such terms and conditions upon a fair and equitable basis, and such decision in each such instance shall be final and shall be binding upon Navy and Standard.

(Emphasis supplied.) Section 2(a)(5) added the following definition of "same geologic structure":

> Same geologic structure . . . as used in the Act of June 17, 1944, the legislative history relating thereto, and this contract shall be deemed to mean and encompass only the oil pools and reservoirs underlying in whole or in part the present boundaries of the Reserve.

In 1973 Standard discovered the Tule Elk Oil field underlying certain Standard property, section 7R, adjacent to the Elk Hills Reserve. It is undisputed that the Tule Elk Oil field extends in part under the 1944 boundaries of the Reserve. On January 18, 1974, the Acting Secretary of the Navy determined that it was therefore "desirable," within the meaning of section 15(b), to include section 7R under the unit plan contract.

After making this desirability determination, the Acting Secretary requested Standard to cease all production from section 7R and to agree to include section 7R in the Unit. Standard refused, stating that in

---

1. We held in *Asphalto*, among other things, that section 15(b) of the UPC empowers the Secretary of the Navy to determine unilaterally: whether it is "desirable" to include within the Unit lands "on the same geologic structure" but outside the Reserve; and the "fair and equitable" terms and conditions of such inclusion. *United States v. Standard Oil Co., supra*, 545 F.2d at 633–36. We reserved in *Asphalto* the question presented here: the meaning of "same geologic structure." *See id.* at 632 n.2.

2. 10 U.S.C. § 7426(a) was amended in 1976, to substitute "the Secretary" for "The Secretary of the Navy." Apparently Congress designed this amendment, in conjunction with section 307(1) of the Department of Energy Reorganization Act, 42 U.S.C. § 7156(1), to shift jurisdiction over the Elk Hills Reserve from the Navy to the Secretary of Energy. The controversy before us predates this amendment; it thus affects none of the issues in this case.

each past instance in which an underlying oil field had extended within the Reserve, but was not on the "Elk Hills structure"[3] as known in 1944, the Navy had not sought to include the overlying land, but rather had protected Navy lands within the Reserve by offset production.[4] Upon Standard's refusal, the Acting Secretary instituted the instant action, and sought and received a preliminary injunction against all production by Standard from section 7R.

The Acting Secretary and Standard then entered into negotiations to determine the terms and conditions of compensation to Standard for the inclusion of section 7R within the Unit. No agreement was reached. The Acting Secretary then made a unilateral decision regarding "fair and equitable" terms and conditions. He rejected Standard's claim for compensation in the amount of the "equitable equivalent" of the property value which Standard would lose by inclusion. Instead, the Acting Secretary determined that Standard would be compensated for the inclusion of section 7R by receiving "consideration oil" equal to one-third of the estimated recoverable oil beneath section 7R, at a delivery rate of 20,-000 barrels of oil per day. This compensation purportedly tracked the measure previously agreed upon by the parties in negotiations for other inclusions within the Unit.

The government's motion for partial summary judgment urged the district court to find that Standard's "section 7R was [properly] included under the UPC." Standard, in response, submitted that the following genuine issues of material fact, among others, precluded partial summary judgment on the inclusion issue: (1) whether section 7R is "on the same geologic structure" within the meaning of 10 U.S.C. § 7426(a), so as to authorize the Acting Secretary to include section 7R under the UPC; (2) whether the Navy had recognized, in past dealings with Standard, that it lacked authority to include land overlying oil fields that extend within the Reserve but are unconnected to the geologic structure known in 1944 as the Elk Hills anticline; (3) whether Standard had consented to the Acting Secretary of the Navy, instead of the Secretary, making determinations pursuant to 15(b) of the UPC; and (4) whether there was adequate consideration paid to Standard to support specific enforcement of section 15(b) of the UPC by a court order including section 7R within the unit.

Thus, the issues of material fact tendered by Standard implicated both the "inclusion" and the "fair and equitable" terms and conditions issues, although the government's motion sought summary judgment only as to "inclusion." Standard sought to link the two issues. It claimed that the district court could not, as the government's motion requested, grant partial summary judgment on the inclusion issue and then later decide, at trial, whether the Acting Secretary's terms and conditions determination was "fair and equitable." Standard

---

3. By "Elk Hills structure" Standard meant the Elk Hills "anticline." Webster's defines anticline as "an upfold or arch of stratified rock in which the beds or layers bend downward in opposite directions from the crest or axis of the fold." Webster's New International Dictionary 94 (3d ed. 1971). Standard contends that because Commander H. P. Stolz, then Officer-in-Charge of Reserve operations, testified in 1944 before the Senate Naval Affairs Committee that the Elk Hills geologic structure "is an anticlinal structure," Hearings on S. 1773 & H.R. 4771 before the Senate Committee on Naval Affairs, 78th Cong., 2d Sess. 27–30 (1944), Congress must have intended, by using the term "same geologic structure" in 10 U.S.C. § 7426(a), to limit the Secretary's power under section 15(b) to lands overlying the "Elk Hills anticline." See discussion infra.

4. Offset production is frequently used when two landowners overlie a common oil pool and cannot agree on a unit plan contract for common production or conservation. Each landowner drills a well on his own land and captures his share of the oil. Essentially, the parties race to deplete the pool, since each will own as much oil as he captures by drilling. This technique, of course, forces the Navy to produce rapidly from its oil lands within the Reserve, or otherwise face permanent depletion of its oil assets. It was partially to prevent such depletion that Congress granted the Navy authority to execute unit plan contracts. See discussion infra.

argued that the "desirability" of including section 7R in the Unit could not be determined without also deciding the cost—i. e., the terms and conditions—of such inclusion.

Moreover, Standard's own motion for partial summary judgment was directed not at the inclusion issue, but at the "fair and equitable" terms and conditions issue. Standard sought a declaration that the contractual standard "on a fair and equitable basis" in section 15(b) requires that the Secretary of the Navy, upon deciding terms and conditions for the inclusion of additional lands, provide Standard with compensation in the amount of the "equivalent" of the rights which Standard would lose by inclusion.[5]

The district judge first granted summary judgment in favor of the government on the inclusion issue. He found that section 7R was on the "same geologic structure" within the meaning of section 15(b). The court disagreed with Standard that "inclusion" could not be decided separately from the "fair and equitable" terms and conditions question.[6] In addition, because Standard had "tendered the issue of the fairness of the terms offered by the Navy, and both parties have had a full and fair opportunity to argue the issue," the district court awarded summary judgment to the government on the "fair and equitable" terms and conditions issue. Standard claims that the district court's summary disposition of each issue—inclusion, and "fair and equitable" terms and conditions—was improper.

## II.

The major issues of material fact offered by Standard with respect to the inclusion issue were: (1) whether 10 U.S.C. § 7426(a) empowered the Acting Secretary to include section 7R; and (2) whether the Navy had recognized, in past dealings with Standard, that it lacked authority to include land overlying oil fields extending within the Reserve but unconnected to the Elk Hills anticline.[7] The first issue is properly one of law, not fact, since it requires interpretation of the UPC terms in light of a congressional statute. We first consider, therefore, whether as a matter of law the district court correctly interpreted section 15(b) of the UPC in light of 10 U.S.C. § 7426(a).

## A.

Standard argues that by the term "same geologic structure," as used in 10 U.S.C. § 7426(a), Congress meant to limit the Navy's unit contracting authority to lands on the Elk Hills anticline, which was the extent of the Elk Hills "geologic structure" known in 1944. The government urges, in response, that Congress intended, by "same geologic structure," to authorize the Navy to enter into unit contracts for common production of all lands overlying oil fields extending at least partly within the Reserve. The Government's position is founded the premise that Congress intended to enable the Navy to protect from drainage all oil fields found, in 1944 or thereafter, to underlie Navy lands within the 1944 boundaries of the Reserve. Standard's interpretation limits the Navy to protection from drainage of the single oil field known in 1944, which was confined to the Elk Hills anticline. Section 2(b)(5) of the UPC, executed by both parties as part of the A & S agreement in 1948, defines "same geologic structure" precisely according to the government's view, as including "only the oil pools and reservoirs underlying in whole

---

5. This measure of compensation, analogous to that normally afforded in condemnation suits, would have afforded Standard 100 percent of the fair market value of the hydrocarbons beneath section 7R, instead of the 33 percent offered by the Acting Secretary pursuant to 15(b).

6. Standard's appeal does not contest this ruling.

7. Standard also alleged a genuine issue of material fact in that it never consented to the substitution of the Acting Secretary of the Navy for the Secretary. The issue was fully raised and argued by both parties. The district court specifically rejected this argument in its Memorandum and Order awarding summary judgment, on the basis that the Acting Secretary had the same power as the Secretary. We affirm that ruling.

or in part the present boundaries of the Reserve." [8]

The purpose of the Act of June 17, 1944 was to protect Navy lands within the Reserve from drainage. *See* S.Rep.No.948, 78th Cong., 2d Sess. 2 (1944). The Act provides for three methods by which the Navy can prevent owners of lands adjoining the Reserve from draining oil fields underlying Navy-owned or Navy-controlled lands. First, the Navy can contract with owners and lessees of such land for (a) conservation of their oil and gas or (b) compensation for estimated drainage in lieu of drilling or operating offset wells. 10 U.S.C. § 7424. Second, and alternatively, the Navy can execute unit plan contracts for common production/conservation of oil from Navy lands and lands outside the Reserve but "on the same geologic structure," 10 U.S.C. § 7426(a). Third, if neither of the first two methods is successful, the Navy can condemn and purchase lands outside the Reserve but on the "same geologic structure." 10 U.S.C. § 7425(a).

With regard to the grant of condemnation authority, the Senate Report for the Act of 1944 states:

"[T]he Navy Department should have the power to condemn lands adjacent to the reserve, if condemnation proceedings are necessary to conserve oil in the reserve in the ground for future emergency use. . . . It has been, and will undoubtedly continue to be, the policy of the Government not to condemn or acquire privately owned oil lands for the purpose of establishing additional reserves for the Navy, unless such acquisition is necessary *to protect the oil in the lands that Navy now controls.*"

S.Rep.No.948, 78th Cong., 2d Sess. 6–7 (1944) (emphasis supplied). The House Report ascribes a similar purpose to the condemnation provision:

The Navy Department's position has been that its powers must be commensurate with its responsibility for the carrying out of the congressional policy *to conserve the Government's oil in the ground.* Whenever that oil is subject to diminution by drainage from privately owned lands or leases, it is the Navy's view that it must be in a position to stop such drainage, by condemnation if need be. Inasmuch as the harm caused by drainage is the same irrespective of whether the drainage is to lands within or without the boundaries of the reserve, adequate protection requires that the condemnation power extend to privately owned lands or leases outside the reserve as well as inside.

The committee has concurred in this view, recognizing that the Navy's purpose as well as the committee's *is to afford protection of what Navy now has* and not to embark upon a program of enlarging the reserve per se by condemning private lands.

H.R.Rep.No.1529, 78th Cong., 2d Sess. 16 (1944) (emphasis supplied).

The Senate and House Reports speak of protecting the oil beneath the Navy's lands, not of protecting only the oil within a particular anticline underlying them. Standard has produced nothing in the legislative history suggesting that Congress wished to foreclose the Navy from either condemning or executing unit plan contracts to prevent drainage of oil fields not yet discovered. The sole item of legislative history produced by Standard to support its interpretation of "same geologic structure" consists of testimony in 1944 before the Senate Naval Affairs Committee, in which the Officer-in-Charge of the Navy's Reserve Operations defined the Elk Hills geologic structure as an "anticlinal structure." [9] This isolated testimony before a Senate Committee does not vitiate the clear expressions of congressional intent in the House and Senate Reports. We conclude, therefore, that Congress did not intend the term "same geolog-

---

**8.** The boundaries of the Reserve had not changed between 1944 and 1948; thus, the reference in the A & S agreement to the "present boundaries of the Reserve" in no way purported to enlarge the Navy's jurisdiction beyond the 1944 boundaries.

**9.** *See* note 3 *supra.*

ic structure," as used in section 7425 pertaining to the condemnation authority, to limit the Navy to protection of lands on the Elk Hills anticline. Rather, we find that section 7425 authorizes the Navy to protect *all* Navy-owned or controlled lands within the Reserve from draining by condemning drainage lands outside the Reserve.

Congress limited both the unit plan contract and condemnation methods to lands outside the Reserve on the "same geologic structure." By using the same term in analogous provisions, Congress presumptively intended to grant the same authority in each. *See Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932); *Hodgson v. Prophet Co.*, 472 F.2d 196, 204 (10th Cir. 1973); *Sampsell v. Straub*, 194 F.2d 228, 230 (9th Cir. 1951), *cert. denied*, 343 U.S. 927, 72 S.Ct. 761, 96 L.Ed. 1338 (1952). Because both the unit plan contract authority in 10 U.S.C. § 7426(a) and the authority to condemn granted in section 7425 were specifically designed to enable the Navy to protect its oil reserves within the Elk Hills Reserve,[10] we find no intent to limit the UPC power to lands on the Elk Hills anticline. Therefore, the section 2(a)(5) definition of "same geologic structure" entered into by the Navy and Standard as part of the 1948 A & S agreement was authorized by 10 U.S.C. § 7426(a), and the Acting Secretary was empowered to rely thereon in making his 15(b) determination.

## B.

Standard's second contention is that a genuine issue of material fact existed regarding prior Navy interpretations of the term "same geologic structure" as used in 10 U.S.C. § 7426(a) and section 15(b) of the UPC. Standard had sought to discover, through requests for admissions, the past conduct of the Navy with respect to oil pools not located on the Elk Hills structure. The government objected to such discovery, claiming that these prior Navy interpretations were irrelevant to the legal issues before the district court pertaining to the meaning of "same geologic structure." The district court apparently agreed with the government, because it granted summary judgment without affording Standard the opportunity to discover the prior Navy interpretations.

We find that the alleged inconsistencies between prior Navy interpretations of "same geologic structure" and the Acting Secretary's interpretation thereof with respect to section 7R did not raise genuine issues of material fact regarding the Acting Secretary's inclusion determination. As

10. There is nothing in the legislative history to explain why Congress also did not limit utilization of the first method, embodied in 10 U.S.C. § 7424, to adjoining lands on the "same geologic structure." Standard claims that the omission of the "same geologic structure" limitation in section 7424 implies Congress' recognition that "(1) there may be pools of oil adjoining a reserve which drain oil from the reserve—i. e., extend in part inside the reserve—but are *not* on the same geologic structure as the reserve;" and that (2) section 7424 provides a means other than offset production by which the Navy can protect such lands. Reduced to its essentials, Standard's argument is that the omission of the "same geologic structure" language in section 7424 proves that Congress intended the inclusion of such language in section 7426 to limit the Navy's unit contracting authority to drainage occurring on the Elk Hills anticline.

We find Standard's argument unpersuasive. Section 7425, which provides condemnation authority, is also limited to lands outside the Reserve "on the same geologic structure." Standard's logic entails that the omission of "same geologic structure" in section 7424 proves Congress' intent that section 7425 be limited to the Elk Hills anticline. We know from the specific legislative history regarding section 7425, however, that Congress intended the condemnation power to protect all the "oil in the lands that Navy now [in 1944] controls." S.Rep.No.948, 78th Cong., 2d Sess. 6–7 (1944). This legislative history belies any intention to confine the condemnation authority to the Elk Hills anticline. Thus, Standard's argument is disproved by the example of section 7425. Standard has not supplied, and we have not found, any reason why its argument is not equally invalid for section 7426. The condemnation and unit contracting provisions serve the same purpose—to conserve all the oil beneath the Navy's lands. We decline to infer that Congress intended to modify this purpose in either section 7425 or section 7426 by omitting the term "same geologic structure" in section 7424.

both parties point out, the interpretation given a statute by the officer or agency charged with its administration should be accorded judicial deference. *New York State Dep't of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Here the Navy's interpretation of "same geologic structure," as used in both 10 U.S.C. § 7426(a) and section 15(b) of the UPC, was clearly reflected in the supplementary contractual provision, which became section 2(a)(5) of the UPC. By ordinary principles of contractual interpretation, the clearly expressed intent of the parties in section 2(a)(5) stands unchanged in the absence of a subsequent agreement, supported by mutual assent and consideration, to modify the contract. Corbin on Contracts § 1294, at 1065 (1 Volume ed. 1952). Moreover, a subsequent oral modification of a written contract that falls within the Statute of Frauds as a contract involving land, as did the UPC, is ineffective unless there has been such "part performance" as to estop the Statute of Frauds enforcement. *Id.* No such reliance by Standard is shown or even argued. Thus, none of the Navy's purported interpretations of "same geologic structure" vary the statutory and contractual interpretation expressed by both Navy and Standard in section 2(a)(5). Nevertheless, we consider each alleged interpretation in turn.

Standard first points to three instances in which the Engineering Committee, a bilateral group composed of two Navy and two Standard representatives, empowered to recommend section 15(b) "desirability" determinations regarding inclusion of lands within the Unit, decided not to advise annexation of lands overlying oil fields extending partly within the Reserve. We doubt that these determinations, by a bilateral committee, should be imputed to the Navy at all. But more importantly, these determinations did not purport to modify the meaning of "same geologic structure" as used in section 15(b) and 10 U.S.C.

§ 7426(a); they simply determined particular instances of "desirability." It may be, as Standard claims, that the former Acting Secretary now believes, as indicated by his deposition, that these desirability determinations were legally required by the term "same geologic structure" in section 15(b). But in light of the Navy's contractual commitment to the language of 2(a)(5), the Acting Secretary's feeling (expressed only in a deposition during this litigation) that the Navy had "no other legal recourse" is insufficient to vary the terms of the contract and the Navy's official interpretation of "same geologic structure" expressed in 2(a)(5).

Standard secondly refers to a 1957 Organizational Manual reciting the Navy's practice of limiting inclusions of new lands to those commercially productive on the "Elk Hills structure." This statement, expressed in a document having nothing to do with the Navy's and Standard's contractual relations, clearly does not vary the statutory and contractual definition of "same geologic structure" embodied in section 2(a)(5). Moreover, there is absolutely no reason to suppose that "Elk Hills structure" was used in the Organizational Manual to denote the structure as known in 1944, as opposed to that known in 1948 when 2(a)(5) was executed. Thus, besides being legally irrelevant, we find that the meaning of language used in the 1957 Organizational Manual does not create a genuine issue of fact.

Because we find, as a matter of law, that there were no issues of material fact pertaining to the correct interpretation of "same geologic structure," as used in 10 U.S.C. § 7426(a) and sections 15(b) and 2(a)(5) of the UPC and amending agreement, we affirm the district court's award of summary judgment regarding the Acting Secretary's inclusion of section 7R within the unit. We next consider whether summary judgment was proper on the terms and conditions issue.

### III.

Both parties agree that the scope of judicial review of the Acting Secretary's determination of terms and conditions is governed by the provisions of the Wunderlich

Act, 68 Stat. 81, 41 U.S.C. §§ 321–322. The Wunderlich Act provides that agency determinations pursuant to a "disputes clause," such as section 15(b) of the UPC, are "final and conclusive unless . . . fra[u]dulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or . . . not supported by substantial evidence." 41 U.S.C. § 321. Thus, pursuant to section 15(b) of the UPC, the Acting Secretary's decision was binding on the parties unless it failed the tests set forth in 41 U.S.C. § 321.

█ In reviewing the district court's grant of summary judgment we must decide whether, "viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), there are genuine issues of material fact. *See Marshall v. Hawaiian Tel. Co.,* 575 F.2d 763, 764 (9th Cir. 1978). When affidavits in support of summary judgment do not contradict facts pleaded by the party opposing summary judgment, the nonmoving party's allegations are taken as true, for purposes of determining the existence of genuine issues of material fact. *Potrero Hill Community Action Comm. v. Housing Authority,* 410 F.2d 974, 974 (9th Cir. 1969); *see Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 158–61, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Standard alleged in its amended answer to the United States' complaint that the Acting Secretary's determination was "capricious, arbitrary, so grossly erroneous as to necessarily imply legal bad faith, and [is] not supported by substantial evidence." Standard also alleged in its amended answer that "[t]he terms and conditions purportedly determined by the [Acting Secretary] for the inclusion of section 7R under the Unit Plan Contract deprive [Standard] of its property without due process of law." Standard alleged numerous deficiencies in the Acting Secretary's conduct, as well as in the merits of his determination, to support these allegations.

Apparently because the government did not seek summary judgment on the terms and conditions issue, it submitted no affidavits contradicting the allegations set forth in Standard's answer. Taken as true, Standard's allegations present genuine issues of material fact, even under the Wunderlich Act's stringent standard of review, regarding the validity of the Acting Secretary's terms and conditions determination.

The government argues, however, that the only facts material to judicial review of an agency determination pursuant to a "disputes" clause covered by the Wunderlich Act are those revealed by the administrative record. *See United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 714–18, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Furthermore, the government argues that review of an agency's decision under the "arbitrary and capricious" standard of the Wunderlich Act presents only a question of law, which may properly be decided by summary judgment. *See Beane v. Richardson,* 457 F.2d 758, 759 (9th Cir.) (per curiam), *cert. denied,* 409 U.S. 859, 93 S.Ct. 144, 34 L.Ed.2d 105 (1972); *Asuncion v. Dist. Director,* 427 F.2d 523, 524 (9th Cir. 1970). The substance of the government's argument is that unless genuine issues of material fact appear on the face of the administrative record which justify reversal as a matter of law on the "arbitrary and capricious" standard of the Wunderlich Act, summary judgment is proper. The Acting Secretary's alleged misinformation about prior Navy-Standard dealings is not revealed on the face of his terms and conditions determination.

In a case in which a complete administrative record is placed before the district court, such logic might supply considerable justification for a summary judgment. Here, however, no certified administrative record was produced. The district court had before it only the letter from the Acting Secretary to Standard announcing the Navy's 15(b) determination, and various Navy-Standard correspondence occurring prior to and after the determination. Certain consultants' reports, which purportedly provided the factual basis for the Acting Secretary's determination, were not filed with the district court.

In *United States v. Carlo Bianchi & Co. supra,* upon which the government relies, a complete, certified administrative record,

including a transcript of the adversary hearing held before the Board of Claims and Appeals of the Corps of Engineers, was presented to the trial court. The Supreme Court held that the Court of Claims violated the Wunderlich Act by receiving evidence outside the record and conducting a *de novo* review of the Board's findings. But the Court specifically stated that

> in situations [unlike *Bianchi*] where the court believed . . . that the departmental determination could not be sustained under the standards laid down by Congress, we see no reason why the court could not stay its own proceedings pending some further action before the agency involved. *Cf. Pennsylvania R. Co. v. United States,* 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165. Such a stay would certainly be justified where the department had failed to make adequate provision for a record that could be subjected to judicial scrutiny, for it was clearly part of the legislative purpose to achieve uniformity in this respect. And in any case·in which the department failed to remedy the particular substantive or procedural defect or inadequacy, the sanction of judgment for the contractor would always be available to the court.

373 U.S. at 717–18, 83 S.Ct. at 1415.[11]

■■■ We do not reach the question whether the Navy in this case "failed to

make adequate provision for a record that could be subjected to judicial scrutiny." *United States v. Carlo Bianchi & Co., supra,* 373 U.S at 718, 83 S.Ct. at 1415. Nor do we reach the substantial issue raised by Standard's claim that the procedures employed by the Acting Secretary in reaching his determination were so inadequate as to fall outside the due process required by the Wunderlich Act. *See L. Rosenman Corp. v. United States,* 390 F.2d 711, 712 n.2, 182 Ct.Cl. 586 (1968); *Roberts v. United States,* 357 F.2d 938, 944, 174 Ct.Cl. 940 (1966). On remand, the district court will need to consider arguments as to the adequacy of the procedures and record as well as the government's contention that Standard waived both procedural and substantive issues by failing to raise them before the Acting Secretary. It may be that after receiving affidavits[12] and hearing argument from each party, the district court will find that the determination is supported by substantial evidence in the record and otherwise satisfies the dictates of the Wunderlich Act. We hold only that the district court should not have awarded, *sua sponte,* summary judgment to the United States on the issue of the regularity of the agency's determinations on terms and conditions of the inclusion.[13] Standard was

**11.** Another procedure, when the administrative record is deficient, is for the district court "to require some explanation [from the agency] in order to determine if the [agency] acted within the scope of [its] authority and if the [agency's] action was justifiable under the applicable standard." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

**12.** Although the Supreme Court has made it clear that, except in cases of alleged fraud, reviewing courts under the Wunderlich Act may not consider evidence outside the record for the purpose of applying the standards of the Act, *United States v. Anthony Grace & Sons, Inc.,* 384 U.S. 424, 428–29, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 418–23, 86

S.Ct. 1545, 16 L.Ed.2d 642 (1966); *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 714–18, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), we do not believe that this rule applies to evidence which is relevant to the adequacy of the procedures employed. Thus, while the district judge may not consider evidence presented by Standard that seeks simply to refute the conclusions reached by the Acting Secretary on disputed questions of fact, he may receive affidavits that seek to show unfairness in the fact-finding procedures employed. Such affidavits might include reference to relevant evidence that was excluded or not considered because of such procedural inadequacies.

**13.** Standard's counsel may inadvertently have misled the district court during the hearing on the motions for summary judgment by declaring, "The entire case, therefore, is before your

deprived of a reasonable opportunity to present affidavits material to its claims of administrative irregularity as to this aspect of the case, and to develop an adequate record for appellate review. *See Fountain v. Filson*, 336 U.S. 681, 683, 69 S.Ct. 754, 93 L.Ed. 971 (1949); *Macklin v. Butler*, 553 F.2d 525, 528–29 (7th Cir. 1977); *Herzog & Straus v. GRT Corp.*, 553 F.2d 789, 791–92 (2d Cir. 1977).

It is the duty of the district court both to avoid substituting its own judgment for that of the agency, which includes limiting its inquiry to a review of an adequate administrative record, and to ensure that the parties receive a fair and impartial airing of their claims by carefully reviewing the record and remanding to the agency if the record is insufficient. The district court here erred in this latter regard. Immediately after the district court's surprise ruling, Standard responded with an extensive and detailed motion for reconsideration. The district court denied the reconsideration motion without comment. We think Standard deserved a longer day in court. We thus reverse the award of summary judgment on the terms and conditions issue and remand that issue to the district court for further consideration.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.

Honor." In one sense counsel's statement was true, since the entire case would have been disposed of had the court adopted the theory of "equitable" compensation urged by Standard. But the adverse judgment on Standard's theory did not validate the Acting Secretary's entire action, and the government's motion for partial summary judgment, which was limited to the inclusion issue, did not put the validity of the terms and conditions determination before the court. To decide "the entire case" in favor of Navy, the district court was required to find that the Acting Secretary's terms and conditions decision was neither capricious, arbitrary, without substantial evidence, nor in bad faith. This issue was not briefed, not argued, and not specifically considered by the district court in its ruling. While such error of the district court was understandable in light of counsel's misleading representation of the status of the case, we conclude that this single statement by counsel did not waive Standard's opportunity to be heard on the issue.