**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1644

MAYOR AND CITY COUNCIL OF BALTIMORE,

Plaintiff – Appellee,

v.

BP P.L.C.; BP AMERICA, INC.; BP PRODUCTS NORTH AMERICA, INC.;
CROWN CENTRAL LLC; CROWN CENTRAL NEW HOLDINGS LLC;
CHEVRON CORP.; CHEVRON U.S.A. INC.; EXXON MOBIL CORP.;
EXXONMOBIL OIL CORPORATION; ROYAL DUTCH SHELL, PLC; SHELL
OIL COMPANY; CITGO PETROLEUM CORP.; CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY; PHILLIPS 66; MARATHON OIL COMPANY;
MARATHON OIL CORPORATION; MARATHON PETROLEUM
CORPORATION; SPEEDWAY LLC; HESS CORP.; CNX RESOURCES
CORPORATION; CONSOL ENERGY, INC.; CONSOL MARINE TERMINALS
LLC,

Defendants – Appellants,

and

LOUISIANA LAND & EXPLORATION CO.; PHILLIPS 66 COMPANY;
CROWN CENTRAL PETROLEUM CORPORATION,

Defendants.

--------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

Amicus Supporting Appellants.

NATIONAL LEAGUE OF CITIES; U.S. CONFERENCE OF MAYORS;
INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; PUBLIC

CITIZEN, INC.; SHELDON WHITEHOUSE; EDWARD J. MARKEY; STATE OF MARYLAND; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; MARIO J. MOLINA; MICHAEL OPPENHEIMER; BOB KOPP; FRIEDERIKE OTTO; SUSANNE C. MOSER; DONALD J. WUEBBLES; GARY GRIGGS; PETER C. FRUMHOFF; KRISTINA DAHL; NATURAL RESOURCES DEFENSE COUNCIL; ROBERT BRULLE; CENTER FOR CLIMATE INTEGRITY; CHESAPEAKE CLIMATE ACTION NETWORK; JUSTIN FARRELL; BEN FRANTA; STEPHAN LEWANDOWSKY; NAOMI ORESKES; GEOFFREY SUPRAN; UNION OF CONCERNED SCIENTISTS,

Amici Supporting Appellee.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Ellen L. Hollander, District Judge. (1:18-cv-02357-ELH)

---

Argued: December 11, 2019                    Decided: March 6, 2020

---

Before GREGORY, Chief Judge, and FLOYD and THACKER, Circuit Judges.

---

Affirmed by published opinion. Judge Floyd wrote the opinion in which Chief Judge Gregory and Judge Thacker joined.

---

**ARGUED:** Theodore J. Boutrous, Jr., GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California, for Appellants. Victor Marc Sher, SHER EDLING LLP, San Francisco, California, for Appellee. **ON BRIEF:** Joshua S. Lipshutz, Washington, D.C., Anne Champion, GIBSON, DUNN & CRUTCHER LLP, New York, New York; Ty Kelly, Jonathan Biran, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C., Baltimore, Maryland, for Appellants Chevron Corporation and Chevron U.S.A., Inc. John B. Isbister, Jaime W. Luse, TYDINGS & ROSENBERG LLP, Baltimore, Maryland; Philip H. Curtis, Nancy G. Milburn, New York, New York, Matthew T. Heartney, John D. Lombardo, ARNOLD & PORTER KAY SCHOLER LLP, Los Angeles, California, for Appellants BP Products North America Inc., BP P.L.C., and BP America Inc. Craig A. Thompson, VENABLE LLP, Baltimore, Maryland; Theodore V. Wells, Jr., Daniel J. Toal, Jaren Janghorbani, New York, New York, Kannon Shanmugam, PAUL, WEISS, RIFKIND, WHARTON, GARRISON LLP, Washington, D.C., for Appellants Exxon

2

Mobil Corporation and ExxonMobile Oil Corporation. David C. Frederick, James M. Webster, III, Brendan J. Crimmins, Grace W. Knofczynski, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C.; Daniel B. Levin, Los Angeles, California, Jerome B. Roth, Elizabeth A. Kim, MUNGER, TOLLES & OLSON LLP, San Francisco, California, for Shell Oil Company and Royal Dutch Shell, PLC. Warren N. Weaver, Peter Sheehan, WHITEFORD TAYLOR AND PRESTON LLP, Baltimore, Maryland; Nathan P. Eimer, Pamela R. Hanebutt, Ryan Walsh, Raphael Janove, EIMER STAHL LLP, Chicago, Illinois, for Appellant Citgo Petroleum Corporation. Michael A. Brown, NELSON MULLINS RILEY & SCARBOROUGH LLP, Baltimore, Maryland; Sean C. Grimsley, Jameson R. Jones, BARTLIT BECK LLP, Denver, Colorado, for Appellants ConocoPhillips and ConocoPhillips Company. Jonathan Chunwei Su, LATHAM & WATKINS LLP, Washington, D.C., for Appellant Phillips 66. Steven M. Bauer, Margaret A. Tough, LATHAM & WATKINS LLP, San Francisco, California, for Appellants ConocoPhillips, ConocoPhillips Company, and Phillips 66. Shannon S. Broome, San Francisco, California, Shawn Patrick Regan, New York, New York, Ann Marie Mortimer, HUNTON ANDREWS KURTH LLP, Los Angeles, California, for Appellants Marathon Petroleum Corp. and Speedway, LLC. Scott Janoe, Houston, Texas, Megan Berge, Emily Wilson, BAKER BOTTS L.L.P., Washington, D.C., for Appellant Hess Corp. Michelle N. Lipkowitz, Thomas K. Prevas, SAUL EWING ARNSTEIN & LEHR LLP, Baltimore, Maryland, for Appellants Crown Central LLC and Crown Central New Holdings LLC. Kathleen Taylor Sooy, Tracy Ann Roman, Washington, D.C., Honor R. Costello, CROWELL & MORING LLP, New York, New York, for Appellants CNX Resources Corporation, Consol Energy Inc., and Consol Marine Terminals LLC. Matthew K. Edling, SHER EDLING LLP, San Francisco, California; Andre M. Davis, Suzanne Sangree, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellee. Steven P. Lehotsky, Michael B. Schon, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C.; Peter D. Keisler, C. Frederick Beckner III, Ryan C. Morris, Tobias S. Loss-Eaton, SIDLEY AUSTIN LLP, Washington, D.C., for Amicus Chamber of Commerce of the United States of America. Michael Burger, Susan Kraham, MORNINGSIDE HEIGHTS LEGAL SERVICES, INC., New York, New York, for Amici The National League of Cities, The United States Conference of Mayors, and the International Municipal Lawyers Association. Scott L. Nelson, Allison M. Zieve, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., for Amicus Public Citizen, Inc. Gerson H. Smoger, SMOGER & ASSOCIATES, P.C., Dallas, Texas; Robert S. Peck, CENTER FOR CONSTITUTIONAL LITIGATION, P.C., Washington, D.C., for Amici Senators Sheldon Whitehouse and Edward J. Markey. Brian E. Frosh, Attorney General, Joshua M. Segal, Special Assistant Attorney General, Steven J. Goldstein, Special Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Xavier Becerra, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. William Tong, Attorney General, OFFICE OF ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Gurbir S. Grewal, Attorney General, OFFICE OF THE

ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, Albany, New York, for Amicus State of New York. Ellen F. Rosenblum, Attorney General, OREGON DEPARTMENT OF JUSTICE, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Thomas J. Donovan, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. William A. Rossbach, ROSSBACH LAW, PC, Missoula, Montana, for Amici Mario J. Molina, Michael Oppenheimer, Bob Kopp, Friederike Otto, Susanne C. Moser, Donald J. Wuebbles, Gary Griggs, Peter C. Frumhoff, and Kristina Dahl. Peter Huffman, NATURAL RESOURCES DEFENSE COUNCIL, Washington, D.C., for Amicus Natural Resources Defense Council. Mark A. Griffin, Amy Williams-Derry, Daniel P. Mensher, Alison S. Gaffney, KELLER ROHRBACK L.L.P., Seattle, Washington, for Amici Robert Brulle, Center for Climate Integrity, The Chesapeake Climate Action Network, Justin Farrell, Benjamin Franta, Stephan Lewandowsky, Naomi Oreskes, Geoffrey Supran, and the Union of Concerned Scientists.

————————————

FLOYD, Circuit Judge:

This appeal is about whether a climate-change lawsuit against oil and gas companies belongs in federal court. But this decision is only about whether one path to federal court lies open. Because 28 U.S.C. § 1447(d) confines our appellate jurisdiction, the narrow question before us is whether removal of this lawsuit is proper under 28 U.S.C. § 1442, commonly referred to as the federal officer removal statute. And because we conclude that § 1442 does not provide a proper basis for removal, we affirm the district court's remand order.

I.

In July 2018, the Mayor and City of Baltimore ("Baltimore") filed suit in Maryland state court against twenty-six multinational oil and gas companies ("Defendants") that it says are partly responsible for climate change.[1] According to Baltimore, Defendants substantially contributed to climate change by producing, promoting, and (misleadingly) marketing fossil fuel products long after learning the dangers associated with them. Specifically, Baltimore alleges that, despite knowing about the direct link between fossil

---

[1] Defendants consist of BP entities (BP P.L.C., BP America, Inc., and BP Products North America Inc.); Crown Central entities (Crown Central Petroleum Corporation, Crown Central LLC, and Crown Central New Holdings LLC); Chevron entities (Chevron Corp. and Chevron U.S.A. Inc.); Exxon Mobil entities (Exxon Mobil Corp. and ExxonMobil Oil Corporation); Shell entities (Royal Dutch Shell PLC and Shell Oil Company); Citgo Petroleum Corp.; ConocoPhillips entities (ConocoPhillips, ConocoPhillips Company, Louisiana Land & Exploration Co., Phillips 66, and Phillips 66 Company); Marathon entities (Marathon Oil Company, Marathon Oil Corporation, Marathon Petroleum Corporation, and Speedway LLC); Hess Corp.; and CONSOL entities (CNX Resources Corporation, CONSOL Energy Inc., and CONSOL Marine Terminals LLC).

fuel use and global warming for nearly fifty years, Defendants have engaged in a "coordinated, multi-front effort" to conceal that knowledge; have tried to discredit the growing body of publicly available scientific evidence by championing sophisticated disinformation campaigns; and have actively attempted to undermine public support for regulation of their business practices, all while promoting the unrestrained and expanded use of their fossil fuel products. *See* J.A. 43–47. As a result of Defendants' conduct, Baltimore avers that it has suffered various "climate change-related injuries," J.A. 92, including an increase in sea levels, storms, floods, heatwaves, droughts, and extreme precipitation. So Baltimore sued Defendants to shift some of the costs of these injuries on to them.

The Complaint asserts eight causes of action, all founded on Maryland law: public and private nuisance (Counts I–II); strict liability for failure to warn and design defect (Counts III–IV); negligent design defect and failure to warn (Counts V–VI); trespass (Count VII); and violations of the Maryland Consumer Protection Act, Md. Code, Com. Law §§ 13-101 to 13-501 (Count VIII). As relief, Baltimore seeks monetary damages, civil penalties, and equitable relief. It does not "seek to impose liability on Defendants for their direct emissions of greenhouse gases" or to "restrain Defendants from engaging in their business operations." J.A. 47.

Two Defendants, Chevron Corporation and Chevron U.S.A. Inc. (collectively, "Chevron"), timely removed the case to the United States District Court for the District of Maryland.

6

Before continuing, a brief introduction to the various grounds for removal is helpful. Under 28 U.S.C. § 1441, the general removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" may be removed by the defendants "to the district court of the United States for the district and division embracing the place where such action is pending." *Id.* § 1441(a); *see also, e.g.*, 28 U.S.C. § 1331 (conferring "original jurisdiction" over cases that "aris[e] under" federal law). In addition, a civil action filed in state court may be removed to federal court if a specialized removal provision applies, such as the bankruptcy removal statute, 28 U.S.C. § 1452, or, as pertinent here, the federal officer removal statute, 28 U.S.C. § 1442.

In this case, Chevron asserted eight grounds for removal. Four of those grounds were premised on federal-question jurisdiction under 28 U.S.C. § 1331. Chevron argued that Baltimore's claims arose under federal law within the meaning of § 1331 because they (1) were governed by federal common law, rather than state law; (2) raised disputed and substantial issues of federal law under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005); (3) were completely preempted by the Clean Air Act, 42 U.S.C. §§ 7401–7671q, as well as the foreign affairs doctrine; and (4) were based on conduct or injuries that occurred on federal enclaves. The remaining grounds relied on alternative jurisdictional and removal statutes, including: (1) the jurisdictional grant in the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b); (2) the admiralty jurisdiction statute, 28 U.S.C. § 1333; (3) the bankruptcy

7

removal statute, 28 U.S.C. § 1452; and (4) the federal officer removal statute, 28 U.S.C. § 1442.[2]

Baltimore then moved to remand the case back to state court under 28 U.S.C. § 1447(c), which some Defendants opposed.[3]  In its forty-five-page opinion granting Baltimore's remand motion, the district court rejected each of the eight theories asserted by Defendants in support of removal.  *See generally BP P.L.C.*, 388 F. Supp. 3d 538.

This timely appeal followed.  Shortly after noticing their appeal, Defendants moved the district court to stay the execution of the remand to state court pending this appeal.  The district court denied the motion, as did this Court.  The Supreme Court likewise denied Defendants' application for a stay.  *See BP P.L.C. v. Mayor & City Council of Balt.*, 140 S. Ct. 449 (2019) (mem.).

---

[2] Because the OCSLA and admiralty statute are jurisdictional, Chevron relied upon the general removal statute, § 1441(a), as the statutory hook for removal for these grounds as well.  As previously noted, the bankruptcy and federal officer statutes are specialized removal provisions.  The bankruptcy statute authorizes removal in cases over which the district court has original jurisdiction per 28 U.S.C. § 1334, including in civil proceedings that "aris[e] in or relate[] to cases under title 11."  *See* 28 U.S.C. § 1452(a).  The federal officer removal statute lies at the heart of this appeal and is discussed in greater detail in Part III.

[3] Five of the twenty-six Defendants did not oppose remand.  *See Mayor & City Council of Balt. v. BP P.L.C.*, 388 F. Supp. 3d 538, 549 n.2 (D. Md. 2019) (noting that three Defendants—Crown Central Petroleum Corp., Louisiana Land & Exploration Co., and Phillips 66 Company—appeared to have been improperly named in the Complaint, and two others—Marathon Oil Company and Marathon Oil Corporation—did not join in the opposition to remand).

8

## II.

As in all cases involving an appeal of a remand order, we must confront the threshold question of our appellate jurisdiction.

"The authority of appellate courts to review district-court orders remanding removed cases to state court is substantially limited by statute," namely, 28 U.S.C. § 1447(d). *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 229 (2007). When a remand is based on a lack of subject-matter jurisdiction, *see Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 638 (2009), review of the remand order "on appeal or otherwise" is typically barred—however "manifestly" and "inarguably erroneous" it may be, *In re Norfolk S. Ry.*, 756 F.3d 282, 287 (4th Cir. 2014) (internal quotation mark omitted)—unless the case was removed pursuant to one of two specialized removal statutes. Specifically, § 1447(d) provides:

> An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.

28 U.S.C. § 1447(d); *see also* 28 U.S.C. § 1442 ("Federal officers or agencies sued or prosecuted"); 28 U.S.C. § 1443 ("Civil rights cases").

Therefore, as a matter of statutory interpretation, we must first determine the scope of our appellate jurisdiction under § 1447(d) de novo. *See Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 242–43 (4th Cir. 2009). As explained below, we conclude that such jurisdiction does not extend to the non-§ 1442 grounds that were considered and rejected by the district court.

9

In *Noel v. McCain*, 538 F.2d 633 (4th Cir. 1976), this Court held that when a case is removed on several grounds, appellate courts lack jurisdiction to review any ground other than the one specifically exempted from § 1447(d)'s bar on review. Thus, in that case, we dismissed an appeal to the extent that it sought review of an order remanding a case for "failure to raise federal questions." *Id.* at 635. "Jurisdiction to review remand of a § 1441(a) removal," we explained, "is not supplied by also seeking removal under § 1443(1)." *Id.*

Because the only ground for removal that is made reviewable by § 1447(d) here is federal officer removal under § 1442, *Noel* teaches that our jurisdiction is confined to this ground alone; it does not extend to the seven other grounds for removal raised by Defendants, even though the district court rejected them in the same remand order.

Notwithstanding our holding in *Noel*, Defendants insist that we have jurisdiction to review the entire remand order. That is so, Defendants say, because *Noel* has been effectively abrogated by the Supreme Court's decision in *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199 (1996), as well as the Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (codified in scattered sections of 28 U.S.C.). They are wrong.

We begin with *Yamaha*. There, the Supreme Court interpreted the word "order" within the meaning of the interlocutory appeal statute, 28 U.S.C. § 1292(b). In particular, the Court addressed whether, under § 1292(b), federal courts of appeals may exercise jurisdiction over *any* question that is included within an order certified for interlocutory appeal or, alternatively, whether such jurisdiction is limited to review of the controlling question of law identified by the district court—i.e., the question that makes an

10

interlocutory appeal appropriate in the first place. *See Yamaha*, 516 U.S. at 204–05. Section 1292(b) provides, in relevant part, that if a district judge concludes that "an order not otherwise appealable" in a civil action "involves a controlling question of law as to which there is substantial ground for difference of opinion," and that "an immediate appeal from the order may materially advance the ultimate termination of the litigation," then the judge shall "so state in writing in such order." 28 U.S.C. § 1292(b). "The Court of Appeals . . . may thereupon, in its discretion, permit an appeal to be taken from such order." *Id.* Based on the text of § 1292(b), the *Yamaha* Court held that appellate jurisdiction under that statute "applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." 516 U.S. at 205. As such, courts of appeals "may address any issue fairly included within the certified order because it is the *order* that is appealable." *Id.* (internal quotation mark omitted).

Although at least one other circuit has found *Yamaha* persuasive in interpreting the word "order" under § 1447(d) as a matter of first impression, *see Lu Junhong v. Boeing Co.*, 792 F.3d 805, 810–13 (7th Cir. 2015),[4] we simply cannot conclude that our contrary interpretation in *Noel* is *abrogated*. True, the Supreme Court's interpretation of the word "order" in *Yamaha* was entirely textual. But it did not purport to establish a general rule

---

[4] Though the Sixth Circuit reached a similar conclusion in *Mays v. City of Flint*, 871 F.3d 437, 442 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1557 (2018), it merely cited *Lu Junhong* in doing so and did not so much as address its earlier precedent applying a contrary rule, *see, e.g.*, *Detroit Police Lieutenants & Sergeants Ass'n v. City of Detroit*, 597 F.2d 566, 567–68 (6th Cir. 1979). Similarly, although the Fifth Circuit has followed *Lu Junhong*'s lead, *see Decatur Hosp. Auth. v. Aetna Health, Inc.*, 854 F.3d 292, 295–97 (5th Cir. 2017), it, too, has potentially conflicting authority on the issue, *see City of Walker v. Louisiana*, 877 F.3d 563, 566 & n.2 (5th Cir. 2017).

11

governing the scope of appellate jurisdiction for every statute that uses that word. *See Yamaha*, 516 U.S. at 205. And for good reason: Section 1292(b) governs *when* an appellate court may review a particular question within its discretion. Section 1447(d), by contrast, limits *which* issues are "reviewable on appeal or otherwise." Put another way, § 1292(b) permits appellate review of important issues before final judgment, but it does not make otherwise non-appealable questions reviewable. Reading "order" to authorize plenary review thus makes sense in the § 1292(b) context, as § 1292(b) only affects the timing of review for otherwise appealable questions. But giving the word "order" the same meaning in the § 1447(d) context would mandate review of issues that are ordinarily unreviewable, period—even following a final judgment. *See generally Yates v. United States*, 135 S. Ct. 1074, 1082 (2015) ("[I]dentical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute.").

The Removal Clarification Act of 2011 does not alter this conclusion. The Act amended § 1447(d), among other statutes, "by inserting '1442 or' before '1443.'" 125 Stat. at 546. Because the Act "retain[s] § 1447(d)'s reference to reviewable 'orders,' even after *Yamaha*," Defendants contend that Congress must have intended to authorize "plenary review" of such orders. Opening Br. 12. Although Defendants are correct that courts may generally "presume" that Congress is "aware of judicial interpretations" of statutes, *Jackson v. Home Depot U.S.A., Inc.*, 880 F.3d 165, 171 (4th Cir. 2018), we find *Yamaha* distinguishable for the reasons stated above. *Yamaha* did not interpret the scope of § 1447(d), let alone involve a remand order. *Cf. Jackson*, 880 F.3d at 170–71 (interpreting word "defendant" to have same meaning in "interlocking removal statutes"). Moreover,

12

to the extent that Defendants attempt to argue that we are not bound by *Noel*'s interpretation of § 1447(d) because *Noel* was decided before orders remanding cases removed pursuant to § 1442 were made reviewable, *see* 538 F.2d at 635 (interpreting prior version of § 1447(d) in which § 1443 was sole exception), we find that argument unpersuasive. Simply put, the fact that Congress later added § 1442 as an exception to § 1447(d)'s no-appeal rule for remand orders does not undermine our holding in *Noel* that appellate courts only have jurisdiction to review those grounds for removal that are specifically enumerated in § 1447(d).

In sum, *Noel* remains binding precedent in this Circuit.[5] Accordingly, "we dismiss this appeal for lack of jurisdiction," *id.*, insofar as it seeks to challenge the district court's determination with respect to the propriety of removal based on federal-question, OCSLA, admiralty, and bankruptcy jurisdiction.

III.

Having determined that we only have jurisdiction to review the district court's conclusion that removal was improper under the federal officer removal statute, we now turn to that issue.

---

[5] We note that we are not alone in continuing to interpret § 1447(d) consistently with *Noel*, even in the wake of *Yamaha* and the passage of the Removal Clarification Act. *See Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1229 (8th Cir. 2012); *see also Claus v. Trammell*, 773 F. App'x 103, 103 (3d Cir. 2019) (citing *Davis v. Glanton*, 107 F.3d 1044, 1047 (3d Cir. 1997)); *Wong v. Kracksmith, Inc.*, 764 F. App'x 583, 584 (9th Cir. 2019) (citing *Patel v. Del Taco, Inc.*, 446 F.3d 996, 998 (9th Cir. 2006)).

13

"We review de novo issues of subject matter jurisdiction, including removal." *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209 (4th Cir. 2016). Although Defendants bear the burden of establishing jurisdiction as the party seeking removal, *see Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004), the federal officer removal statute must be "liberally construed," *Watson v. Philip Morris Co.*, 551 U.S. 142, 150 (2007) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)). As such, the ordinary "presumption against removal" does not apply. *See Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018).

The federal officer removal statute authorizes the removal of state-court actions filed against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Its "basic purpose" is to protect against the interference with federal operations that would ensue if a state were able to arrest federal officers and agents acting within the scope of their authority and bring them to trial in a state court for an alleged state-law offense. *Watson*, 551 U.S. at 150 (explaining that state-court proceedings may "reflect local prejudice against unpopular federal laws or federal officials," "impede [enforcement of federal law] through delay," or "deprive federal officials of a federal forum in which to assert federal immunity defenses" (internal quotation marks omitted)).

Thus, to remove a case under § 1442(a)(1), a *private* defendant must show: "(1) that it 'act[ed] under' a federal officer, (2) that it has 'a colorable federal defense,' and (3) that the charged conduct was carried out for [or] in relation to the asserted official authority."

14

*Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017) (first alteration in original) (citations omitted). Here, Defendants assert that Baltimore's state-court action is removable under the federal officer removal statute "because the City bases liability on activities undertaken at the direction of the federal government." *BP P.L.C.*, 388 F. Supp. 3d at 567 (internal quotation mark omitted). It is the first and third prongs that are therefore in dispute. *See* Resp. Br. 14–21. We begin with the first, though the acting-under and causal-nexus prongs often "collapse into a single requirement." *In re MTBE Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007); *see also* 28 U.S.C. § 1442(a)(1) (targeting for removal state-court actions "for or relating to any act under color of [federal] office").

A.

The statutory phrase "acting under" describes "the triggering relationship between a private entity and a federal officer." *Watson*, 551 U.S. at 149. Although the words "acting under" are "broad," the Supreme Court has emphasized that they are not "limitless." *Id.* at 147. In cases involving a private entity, the "acting under" relationship requires that there at least be some exertion of "subjection, guidance, or control" on the part of the federal government. *See id.* at 151 (quoting Webster's New International Dictionary 2765 (2d ed. 1953)). Additionally, "precedent and statutory purpose" make clear that "'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152.

In *Watson*, the Supreme Court held that "simply *complying* with the law" does not constitute the type of "help or assistance necessary to bring a private [entity] within the

15

scope of the statute," *id.*, no matter how detailed the government regulation or how intensely the entity's activities are supervised and monitored, *see id.* at 153. In doing so, the Court distinguished several decisions cited by the defendant there in which lower courts had held that private *contractors* fell within the terms of § 1442(a)(1), at least where the relationship was "an unusually close one involving detailed regulation, monitoring, or supervision." *Id.* at 153 (citing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998)). The difference between those cases and a case involving a highly regulated private firm, the Court reasoned, was the fulfillment of a government need:

> The answer to this question lies in the fact that the private contractor in such cases is helping the Government to produce an item that it needs. The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks. In the context of *Winters*, for example, Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.

*Id.* at 153–54.

The Supreme Court found these circumstances sufficient to distinguish Dow Chemical (the contractor in *Winters*) from the regulated tobacco companies who sought removal in *Watson*, and so it did not address "whether and when particular circumstances may enable private contractors to invoke the statute." *Id.* at 154. Nevertheless, in light of the Court's reasoning, we have relied on *Watson* to hold that certain private contractors "act under" federal officials. *See Sawyer*, 860 F.3d at 255. In *Sawyer*, we observed that "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it

16

*manufactured for the government.*" *Id.* Thus, in that case, we found that the defendant "acted under" the United States Navy when it manufactured boilers to be used aboard naval vessels per a detailed government contract. *See id.* at 252–53, 255.

B.

Here, Defendants collectively seek removal under § 1442 based on three contractual relationships between certain Defendants and the federal government: (1) fuel supply agreements between one Defendant (Citgo) and the Navy Exchange Service Command ("NEXCOM") from 1988 to 2012; (2) oil and gas leases administered by the Secretary of the Interior under the OCSLA; and (3) a 1944 unit agreement between the predecessor of another Defendant (Chevron) and the U.S. Navy for the joint operation of a strategic petroleum reserve in California known as the Elk Hills Reserve. For the reasons that follow, we agree with Baltimore that none of these relationships are sufficient to justify removal under the federal officer removal statute in this case, either because they fail to satisfy the acting-under prong or because they are insufficiently related to Baltimore's claims for purposes of the nexus prong.

1.

First, we have little trouble concluding that the NEXCOM fuel supply agreements do not satisfy the "acting under" requirement. These agreements required Defendant Citgo to advertise, supply, and distribute gasoline and diesel to NEXCOM, which NEXCOM resold at a discount to "active duty military, retirees, reservists, and their families" at "service stations operated by NEXCOM on Navy bases located in a number of states across

17

the country." J.A. 216. Although Defendants contend that Citgo helped "the Government to produce an item that it needs" by selling NEXCOM fuel for resale on Navy bases, *see Watson*, 551 U.S. at 153, such logic would bring every seller of contracted goods and services within the ambit of § 1442 when the government is a customer.

We refuse to adopt such a sweeping interpretation of *Watson*. In our view, the key lesson from *Watson* is that closely supervised government contractors are distinguishable from intensely regulated private firms because the former assist the government in carrying out basic governmental functions. *See* 551 U.S. at 153–54 ("The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks . . . . [that] the Government itself would [otherwise] have . . . to perform."). And the provision of means to engage in chemical warfare, as in *Winters*, or even the provision of specific component parts to be used aboard military vessels, as in *Sawyer*, is different in kind from the provision of motor vehicle fuel for resale on Navy bases—both in terms of the nature of the "item" provided and the level of supervision and control that is contemplated by the contract.

To be sure, other circuits have applied the *Watson* dictum beyond the military-procurement-contract context, and we do not suggest that only defense contractors may invoke the federal officer removal statute.[6] Yet none of those cases have confronted a

---

[6] For cases involving people other than defense contractors, see, for example, *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237,1245–49 (9th Cir. 2017); *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457, 469 (3d Cir. 2015); *Bell v. Thornburg*, 743 F.3d (Continued)

18

contract like the one we have here, which involves the sale of a standardized consumer product.  Indeed, the Ninth Circuit has held, albeit in an unpublished decision, that the fact that the federal government purchases "off-the-shelf" products from a manufacturer "does not show that the federal government [has] supervised [the] manufacture of [such products] or directed [that they be] produce[d] in a particular manner, so as to come within the meaning of 'act[ed] under.'"  *Washington v. Monsanto Co.*, 738 F. App'x 554, 555 (9th Cir. 2018) (sixth alteration in original) (quoting 28 U.S.C. § 1442(a)(1)).

Although Defendants strongly resist the off-the-shelf-products analogy by pointing to particular provisions in the fuel supply agreements, we find those provisions unavailing. Defendants emphasize that the agreements: (1) "set forth detailed 'fuel specifications' that required compliance with specified American Society for Testing and Materials standards, and compelled NEXCOM to 'have a qualified independent source analyze the products' for compliance with those specifications"; (2) "authorized the Contracting Officer to inspect delivery, site, and operations"; and (3) "established detailed branding and advertising requirements."  Reply Br. 19–20 (footnotes omitted).  But we have reviewed the contractual provisions cited by Defendants, and they are a far cry from the type of close supervision that existed in both *Sawyer* and *Winters*.  *See Sawyer*, 860 F.3d at 253 (noting that the Navy provided "highly detailed ship [and military] specifications" that boilers were required to match, and exercised "intense direction and control . . . over all written

---

84, 89 (5th Cir. 2014); *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1232–35 (8th Cir. 2012); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1088 (6th Cir. 2010).

19

documentation to be delivered with its naval boilers," including warnings (internal quotation marks omitted)); *Winters*, 149 F.3d at 398–99 (noting that the Department of Defense required Dow Chemical to provide Agent Orange under threat of criminal sanctions, maintained strict control over the chemical's development, and required that it be produced according to its specifications); *cf. Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (rejecting "off-the-shelf argument" because "commercially available products did not contain the Agent Orange herbicides in a concentration as high as that found in Agent Orange"). Rather, the cited provisions seem typical of any commercial contract. They are incidental to sale and sound in quality assurance.[7]

2.

Next up are the oil and gas leases. Defendants allege that Chevron and "other Defendants" have extracted oil and gas on the federal Outer Continental Shelf ("OCS")[8] pursuant to a leasing program administered by the Secretary of the Interior under the OCSLA. J.A. 212; *see, e.g.*, J.A. 233–39 (boilerplate lease); *see also Jewell*, 779 F.3d at

---

[7] In light of the misleading-marketing allegations that are at the center of Baltimore's Complaint, we pause to note that the "detailed branding and advertising requirements" cited by Defendants have absolutely nothing to do with those allegations. They simply address whether and when the government will market a branded product under a contractor's brand or trade name. *See BP P.L.C. v. Mayor & City Council of Balt.*, No. 18-2357 (D. Md.), ECF No. 127-6 at 23 (§ C.11), ECF No. 127-7 at 15 (§ C.9).

[8] The OCS is "a vast underwater expanse" that begins "a few miles from the U.S. coast, where states' jurisdiction ends," and "extends roughly two hundred miles into the ocean to the seaward limit of the international-law jurisdiction of the United States." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015); *see also* 43 U.S.C. § 1331(a) (defining "outer Continental Shelf"). "Billions of barrels of oil and trillions of cubic feet of natural gas lie beneath [it]." *Jewell*, 779 F.3d at 592.

592 ("The [OCSLA] created a framework to facilitate the orderly and environmentally responsible exploration and extraction of oil and gas deposits on the OCS. It charges the Secretary of the Interior with preparing a program every five years containing a schedule of proposed leases for OCS resource exploration and development.").

The leases grant lessees "the exclusive right and privilege to drill for, develop, and produce oil and gas resources" in the submerged lands of the OCS in exchange for certain royalties on production, *see* J.A. 233–34, and requires them to exercise diligence in the development of the leased area by engaging in exploration, development, and production activities in accordance with government-approved plans, *see* J.A. 234; *see also* 30 C.F.R. §§ 550.200–.299 (expounding plans referenced in lease). The leases also place certain conditions on the disposition of oil and gas that is produced. Defendants highlight two such conditions. The first mandates that twenty percent of production be offered to "small or independent refiners." J.A. 235. The second gives the government a right of first refusal to purchase all production "[i]n time of war or when the President of the United States shall so prescribe." J.A. 235.

Defendants argue that the foregoing provisions demonstrate that the Defendant lessees were "acting under" the Secretary of the Interior in extracting, producing, and selling fossil fuel products on the OCS. We disagree.

For starters, we note that many of lease terms are mere iterations of the OCSLA's regulatory requirements. Though OCS resource development is highly regulated, "differences in the degree of regulatory detail or supervision cannot by themselves transform . . . regulatory *compliance* into the kind of assistance" that triggers the "acting

21

under" relationship. *See Watson*, 551 U.S. at 157. Of course, the presence of a contractual relationship (here, a lease) is an important distinction. But we are skeptical that the willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, without more, could ever be characterized as the type of assistance that is required to trigger the government-contractor analogy. *See, e.g.*, *Bd. of Cty. Comm'rs v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 977 (D. Colo. 2019) ("At most, the leases appear to represent arms-length commercial transactions whereby ExxonMobil agreed to certain terms (that are not in issue in this case) in exchange for the right to use government-owned land for their own commercial purposes."), *appeal docketed*, No. 19-1330 (10th Cir. Sept. 9, 2019).

Moreover, we need not decide whether the OCSLA leases are distinguishable from other more run-of-the-mill natural-resources leases because they implicate national energy needs. Either way, we are not convinced that the supervision and control to which OCSLA lessees are subject connote the sort of "unusually close" relationship that courts have previously recognized as supporting federal officer removal. *See Watson*, 551 U.S. at 153–54; *see also supra* pp. 19–20 (discussing *Winters* and *Sawyer*). As Baltimore points out, the leases do not appear to dictate that Defendants "extract fossil fuels in a particular manner." Resp. Br. 18. Nor do they appear to vest the government with control over "the composition of oil or gas to be refined and sold to third parties," let alone purport to affect "the content or methods of Defendants' communications with customers, consumers, and

others about Defendants' [fossil fuel] products." Resp. Br. 18; *accord Suncor Energy*, 405 F. Supp. 3d at 976–77.[9]

Finally, even to the extent that the OCSLA leases toe the "acting under" line, we still agree with the district court's analysis as to § 1442's third prong. Any connection between fossil fuel production on the OCS and the conduct alleged in the Complaint is simply too remote.

To satisfy the third prong, the conduct charged in the Complaint need only "relate to" the asserted official authority. *See Sawyer*, 860 F.3d at 257–58; *see also* 28 U.S.C. § 1442(a)(1) ("for *or relating to* any act under color of such office" (emphasis added)). That is, there must be "a connection or association between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (emphasis omitted) (quoting *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016)). We elaborated upon this requirement in *Sawyer*. There, we held that the district court imposed "a stricter standard of causation than that recognized by the statute" by demanding a showing of "specific government direction" as to whether the defendant manufacturer should have warned shipyard workers who assembled boilers for use aboard naval vessels about the dangers of asbestos, which

---

[9] Defendants do not seriously contend otherwise. Instead, in their documents here and below, they repeatedly point to the same lease provisions that we cite above, without further explanation. This is a complex case, and we do not intend to suggest that Defendants were required to outline the leases' requirements in painstaking detail in order to satisfy their burden of justifying federal officer removal. But they must provide "'candid, specific and positive' allegations that they were acting under federal officers." *In re MTBE*, 488 F.3d at 130 (citation omitted) (quoting *Willingham v. Morgan*, 395 U.S. 402, 408 (1969)). Here, the lack of any specificity as to federal direction leaves us unable to conclude that the leases rise to the level of an unusually close relationship, as required by the first "acting under" prong.

was a component of the boilers manufactured by the defendant under a contract with the Navy. *See id.* at 252, 258. Notably, the Navy required the use of asbestos in boilers despite its known dangers; dictated the content of the warnings that accompanied the boilers; and the defendant manufacturer complied with those requirements. Accordingly, we concluded that the defendant's performance of the contract was "sufficient to connect the plaintiffs' claims, which fault[ed] warnings that were *not* specified by the Navy, to the warnings that the Navy specified and with which [the defendant] complied." *Id.* at 258 (emphasis added); *see also id.* ("These claims undoubtedly 'relat[e] to' all warnings, given or not, that the Navy determined in its discretion." (alteration in original)).

In this case, the district court held that even if the "acting under" and "colorable federal defense" requirements were satisfied, Defendants did not plausibly assert that the charged conduct was carried out "for or relating to" the alleged official authority, given the "wide array of conduct" for which they were sued. *See BP P.L.C.*, 388 F. Supp. 3d at 568–69. Specifically, the court explained that Defendants were sued "for their contribution to climate change by producing, promoting, selling, and concealing the dangers of fossil fuel products," and yet failed to show that a federal officer "controlled their total production and sales of fossil fuels," or "directed them to conceal the hazards of fossil fuels or prohibited them from providing warnings to consumers." *Id.* at 568.

On appeal, Defendants take issue with primarily two aspects of the district court's analysis. First, they argue that the lack of direction as to concealment or warnings is irrelevant to some of Baltimore's claims, namely, strict liability for design defect. Second,

24

they contend that a lack of control as to *total* production and sales is not dispositive under *Sawyer*'s relaxed reading of the third "nexus" prong.

We disagree with Defendants on both fronts. When read as a whole, the Complaint clearly seeks to challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign. Of course, there are many references to fossil fuel production in the Complaint, which spans 132 pages. But, by and large, these references only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil fuel products contribute to greenhouse gas pollution. Although this story is necessary to establish the avenue of Baltimore's climate change-related injuries, it is not the source of tort liability. Put differently, Baltimore does not merely allege that Defendants contributed to climate change and its attendant harms by producing and selling fossil fuel products; it is the concealment and misrepresentation of the products' known dangers—and simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change.[10]

---

[10] The same holds true for Baltimore's strict-liability design-defect claim. As Defendants point out, design-defect claims generally focus on "the product itself," rather than "the conduct of the manufacturer." *Phipps v. Gen. Motors Corp.*, 363 A.2d 955, 958 (Md. 1976). But that is not how Baltimore has framed its claim. Instead, Baltimore relies on the same misleading-marketing and denialist-campaign allegations cited above, averring that Defendants not only failed to warn the public about the climate effects they knew would result from the normal use of their products, but also took affirmative steps to misrepresent the nature of those risks, such as by disseminating information aimed at casting doubt on the integrity of scientific evidence that was generally accepted at the time and by advancing their own pseudo-scientific theories. According to Baltimore, these tactics "prevented reasonable consumers from forming an expectation that fossil fuel (Continued)

25

For this reason, the lack of federal control over the production and sale of *all* fossil fuel products is relevant to the nexus analysis, and the district court did not err in relying upon that fact in finding that any connection between the charged conduct and the asserted official authority was even further diminished. If production and sales went to the heart of Baltimore's claims, we might be inclined to think otherwise. After all, the alleged government-directed conduct (here, the production and sale of fossils fuels extracted on the OCS) need only "relate to" the conduct charged in the Complaint. But given the foregoing allegations, we agree with the district court's conclusion that the relationship between Baltimore's claims and any federal authority over a portion of certain Defendants' production and sale of fossil fuel products is too tenuous to support removal under § 1442.

In sum, we hold that the Defendants who participated in the OCSLA leasing program were not "acting under" federal officials in extracting and producing fossil fuels

---

products would cause grave climate changes." J.A. 161; *see also Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 461 (D. Md. 2019) (explaining that Maryland applies a consumer-expectation test in design-defect cases, and only applies the risk-utility test when the product malfunctions in some way (citing *Halliday v. Sturm, Ruger & Co.*, 792 A.2d 1145 (Md. 2002)). Under Baltimore's own theory of liability, then, its design-defect claim hinges on its ability to demonstrate that Defendants' promotional efforts deprived reasonable consumers of the ability to form expectations that *they would have otherwise formed*. Though we agree with Defendants that Baltimore's theory appears to be a novel one, at least in the design-defect context, this may be a function of the unique circumstances that have allegedly given rise to this litigation. For our purposes, it is sufficient that Baltimore has limited its design-defect theory to one that turns on the promotion allegations, which have nothing to do with the action purportedly taken under federal authority. The viability of such a theory under Maryland law is a question for the Maryland courts to decide.

on the OCS, and any connection between such activity and Baltimore's claims is too attenuated in any event.

3.

That leaves the 1944 unit agreement governing the operation of the Elk Hills Reserve. Because the agreement has a complicated history, we begin with its origin and purpose, followed by a general overview of its terms (or at least those in dispute). In the end, however, we decline to pass on the question of whether it satisfies the "acting under" prong. Like the OCSLA leases, we hold that the agreement fails to meet the third prong in any event.

a.

The Elk Hills Reserve is located in Kern County, California, and originated from a 1912 Executive Order.

> At the turn of the [twentieth] century, Government lands in the West were rapidly being turned over to private ownership. At the same time, there was a growing realization of the importance of oil for the Navy, which was then changing its ships from coal to oil burning. In response to arguments that the Government should preserve oil for Naval purposes, President Taft withdrew large portions of land in California and Wyoming from eligibility for private ownership, and in 1912 set aside [the Elk Hills Reserve] by an Executive Order. . . .
>
> The establishment of the Reserve was expressly made subject to pre-existing private ownership. There are approximately 46,000 acres within the Reserve, approximately one-fifth [was] owned by [the Standard Oil Company of California] and the remainder, approximately four-fifths by Navy. The Standard lands [were] not in one block, but [were] checker-boarded throughout the Reserve. The Executive Order establishing the Reserve affected the Government lands in the field as far as future use and disposition

27

were concerned, but it had no effect on the privately owned lands, and the owners of those lands were free to use and dispose of them as they saw fit.

*United States v. Standard Oil Co.*, 545 F.2d 624, 626–27 (9th Cir. 1976).[11]

Because production from one part of the Elk Hills Reserve could have reduced the amount of oil underlying another part of the Reserve, the Navy and Standard Oil (a Chevron predecessor) initially "had an understanding to the effect that neither would drill wells . . . without six months' notice to the other." *Id.* at 627; *see also id.* (explaining that underlying both parties' lands were "separate accumulations of hydrocarbons," which, "unlike solid minerals, do not remain in place but move because of changes in underground pressure and [thus] move toward producing wells"). But the tension between Standard's legitimate goal of producing oil on its land and the Navy's duty to conserve its hydrocarbons in the ground until needed in an emergency became untenable on the brink of World War II. So the parties began negotiations over "an exchange, purchase or condemnation of Standard's land in the Reserve on the one hand, or their operation as a unit with the Navy land," on the other. *Id.*

These negotiations ultimately resulted in the 1944 Unit Plan Contract ("UPC").[12] A "unit agreement" is "a common arrangement in the petroleum industry where two or more

---

[11] *Standard Oil* involved a prior dispute over the same agreement, in which the Ninth Circuit endorsed the foregoing summary agreed upon by the parties in a pretrial statement.

[12] The parties entered into an earlier contract in 1942, but it was voluntarily terminated in 1943 due to doubts expressed by the Attorney General as to its legality. *Id.* The parties entered into the UPC in 1944, after Congress passed enabling legislation. *See id.* The UPC governed the joint operation and development of three initial "commercially productive zones" underlying the Elk Hills Reserve, two of which contained oil (the (Continued)

28

owners have interests in a common pool," which is operated as a "unit." *Id.* The parties

share production and costs in agreed-upon proportions, and, ordinarily, the objective is "to

produce currently, at minimum expense and pursuant to good engineering practices." *Id.*

The UPC involved here, however, was unique in that "its purpose was not to produce

currently, and its effect was to conserve as much of the hydrocarbons in place as was

feasible until needed for an emergency." *Id.* "This required curtailing production of

Standard's hydrocarbons along with that of Navy, for which Standard would have to

receive compensation." *Id.* Accordingly, "in consideration for Standard curtailing its

production plus giving up certain other rights," *id.* at 627–28, the UPC gave Standard the

right to take specified volumes of oil from certain zones in the pool—namely, an average

of 15,000 barrels per day, or a lesser amount fixed by the Secretary of the Navy, with (a) a

ceiling of 25,000,000 barrels or one-third of Standard's total share, whichever was less,

and (b) a floor of an amount sufficient to cover Standard's out-of-pocket expenses in

maintaining the Reserve in good oil-field condition, *see id.* at 628; J.A. 245–46, 250–52.

---

Stevens Zone and Shallow Oil Zone). Only the latter zone is at issue here, and all of the
provisions discussed in this opinion pertain to that zone.

b.

With this background in mind, we turn to the specific UPC provisions relied upon by Defendants to establish that one of their predecessors (Standard) "acted under" the Navy when it engaged in fossil fuel production during the twentieth century.

In the main, Defendants stress that the UPC gave the Navy "*exclusive control* over the exploration, prospecting, development, and operation of the [Elk Hills] Reserve," and the "*full and absolute power* to determine . . . the quantity and rate of production from[] the Reserve." Reply Br. 18 (second alteration in original); *accord* J.A. 249–50. In particular, they note that the UPC "obligated" Standard "to operate the Reserve in such manner as to produce 'not less than 15,000 barrels of oil per day,'" and allowed the Navy to suspend or increase the rate of production in its "discretion," Reply Br. 18–19 (first quoting J.A. 250, § 4(b); then citing J.A. 250–51, §§ 4(b), 5(d)(1)).

Baltimore counters that these provisions do not establish that Standard was producing oil at the direction of a federal officer. According to Baltimore, these provisions merely required that the pool be maintained in a manner that would have made it *capable* of producing at least 15,000 barrels per day until Standard received its share under the contract. *See* J.A. 250, § 4(b) ("Until Standard shall have received . . . its share of production . . . , the Reserve shall be developed and operated in such manner and to such extent as will, so far as practicable, permit production . . . to be maintained at a rate sufficient to produce therefrom not less than 15,000 barrels of oil per day . . . ."). As a result, Baltimore argues that Standard could have complied with the contract by producing no oil at all, unless and until the Navy elected to increase the rate of production via

30

congressional authorization.[13]    And even then, Baltimore says, the contract did not necessarily make *Standard* responsible for production on the Navy's behalf. *See generally* J.A. 249, § 3(a) ("Navy shall, subject to the provisions hereof, have the exclusive control over the exploration, prospecting, development, and operation of the Reserve, and Navy may, in its discretion, explore, prospect, develop, and/or operate the Reserve directly with its own personnel *or* it may contract for all or any part of such [activities] with competent and responsible parties[, including] . . . Standard . . . ." (emphasis added)).

At oral argument, Defendants shifted their focus away from whether the 15,000-barrels-per-day provision actually required Standard to produce any oil, as they argued in their briefs.  Instead, Defendants pointed to the Naval Petroleum Reserves Production Act of 1976 ("1976 Act"), which "authorized and directed" the Secretary of the Navy to produce the Elk Hills Reserve "at the maximum efficient rate consistent with sound engineering practices for a period not to exceed six years," Pub. L. No. 94-258, 90 Stat. 303, 308; *see also supra* note 13 (discussing UPC's congressional-authorization requirement).  Congress authorized this increase in production after determining that "the Navy's intent to maintain a petroleum reserve, in case of national emergency in 1944, was

---

[13] *See generally* J.A. 246, recitals § 8 ("[The UPC] does not and cannot, in and of itself, authorize the production of any of Navy's share of the oil, . . . as distinct from that portion of Standard's share hereinafter permitted to be produced and received by Standard under the terms of [the above-cited provisions].  The production of the remainder of Standard's share and of all of Navy's share must, except for the purpose of protecting, conserving, maintaining, or testing the Reserve, be preceded by and based upon [congressional] authorization . . .; and references hereinafter to an authorization or election by Navy to order the production of any such oil are intended to be limited to action by the Navy within the terms of any such [authorization].").

no longer relevant," *Chevron U.S.A., Inc. v. United States*, 71 Fed. Cl. 236, 244 (2006), and in response to the 1973 oil crisis, J.A. 214. The 1976 Act also gave the Secretary the authority "to sell or otherwise dispose of the United States share of such petroleum produced from" the Elk Hills Reserve. *See* 90 Stat. at 308.

Shortly thereafter, in 1977, Congress transferred authority over the Elk Hills Reserve to the Department of Energy and assigned to it the Navy's interest in the Reserve as well as the UPC. *Chevron*, 71 Fed. Cl. at 244–45. Standard, and later Chevron as a successor, "continued its interest in the joint operation" of the Reserve until 1997. J.A. 214.

c.

The parties' dispute about the UPC and its significance for purposes of federal officer removal thus can be distilled to two main issues. First, was any oil ever produced from the Elk Hills Reserve at the Navy's direction? And second, if so, was it Standard who carried out those orders?

In light of the 1976 Act, we think the answer to the first question is yes. But as to the second, we simply have no idea whether production authorized by Congress was carried out by Standard. At oral argument, counsel for Chevron merely stated that it was his "understanding" that Standard extracted oil on the Navy's behalf under the unit agreement, and, more generally, that the government relies upon private companies because it does not have its own oil and gas engineers or drilling equipment. And although counsel later submitted a Rule 28(j) Letter stating that the government had final authority over all

32

production, "which was carried out by Standard, and later Chevron," Appellants' Letter Suppl. Authorities 1, ECF No. 133, the letter merely cites the UPC *as a whole* in support of this assertion. In other words, it does not explain why Baltimore's reliance on the operational-control provision cited above is misplaced, *see* J.A. 249, § 3(a), nor does it point to any other provision or provisions that support a different reading.[14] Thus, we are left wanting for pertinent details about Standard's role in operating the Elk Hills Reserve and producing oil therefrom on behalf of the Navy, which might bear directly upon the "acting under" analysis. Indeed, if Standard was not responsible for producing the oil authorized by Congress in 1976, the upshot is that any extensive government control contemplated by the UPC only affected the parties' relative shares and the development of the Reserve, not Standard's duties with respect to any production carried out for the Navy's benefit.

Nevertheless, even if we were to conclude that Standard was responsible for such production under the UPC—and that this responsibility transformed Standard into a person "acting under" the Navy for purposes of § 1442—the production of oil from the Elk Hills Reserve by the predecessor of one of the twenty-six Defendants, like the production of fossil fuels on the OCS, is not sufficiently "related" to Baltimore's claims. *See supra* pp.

---

[14] Because Baltimore only claimed that Standard was not responsible for production at oral argument—in response to Defendants' reliance on the 1976 Act, which Defendants, in turn, did not rely upon in their briefs on appeal—this issue is not addressed in Defendants' briefing, either. Nor can we find any relevant explanation in the federal-officer allegations in the Notice of Removal.

23–26. Accordingly, the district court was correct in concluding that the UPC cannot support federal officer removal in this case.

## IV.

For the foregoing reasons, we affirm the district court's order granting Baltimore's motion to remand.

*AFFIRMED*